VACATED by Opinion and Order entered 7/07/2009

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

TORREY BAUER, et al.,              )
                                   )
    Plaintiffs,                )
                                   )
    v.                         )     CAUSE NO.: 3:08-CV-196-TLS
                                   )
RANDALL T. SHEPARD, et al.,        )
                                   )
    Defendants.                )

## OPINION AND ORDER

This case is the resurrection of a 2004 lawsuit, filed in this district, in which one of the Plaintiffs, Indiana Right to Life (IRL), asked the court to enjoin the Commission on Judicial Qualifications and the Indiana Disciplinary Commission from enforcing certain provisions of the Indiana Code of Judicial Conduct (the Code) that might prohibit judicial candidates from responding to an IRL questionnaire. IRL partially prevailed at the district court level, *Ind. Right to Life, Inc. v. Shepard*, 463 F. Supp. 2d 879 (N.D. Ind. 2006), but the Court of Appeals for the Seventh Circuit reversed, holding that without more proof of "willing speakers" IRL lacked standing to sue, *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545 (7th Cir. 2007).  This time IRL has brought suit along with two willing speakers (judicial candidates) as Plaintiffs. Having remedied the standing problem, the Plaintiffs once again seek a preliminary injunction enjoining the enforcement of certain provisions of the Code.

## FACTS

The relevant facts in this case are essentially the same as in the previous suit filed in this district, and they are recounted as follows.

**A.      Constraints on Candidates Running for Judicial Office in Indiana**

Candidates running for judicial office in Indiana, whether they are incumbent judges running for reelection or attorneys challenging for a position on the bench, are subject to the Indiana Code of Judicial Conduct, which consists of five canons. Two clauses of the Code's fifth canon are at issue in these preliminary injunction proceedings.[1] Canon 5A(3)(d)(i) provides that candidates for judicial office shall not "make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office." This has become known as the "pledges and promises clause." Canon 5A(3)(d)(ii) provides that candidates for judicial office shall not "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." This has become known as the "commits clause."

The Indiana Commission on Judicial Qualifications (CJQ), the members of which are sued here in their official capacities, is tasked with investigating and prosecuting possible violations of the judicial canons by judges and justices. Ind. Code § 33-38-13-13. The judicial canons are made applicable to attorneys running for judicial office through Indiana Rule of Professional Conduct 8.2(b). The Indiana Disciplinary Commission (IDC), whose members are also sued here in their official capacities, is responsible for enforcing the provisions of the Code applicable to attorneys. Ind. Rules for Admission and Discipline 23(2). Both the CJQ and IDC are arms of the Indiana Supreme Court.

Margaret Babcock has served as counsel to the CJQ since 1992. She served as a staff

---

[1]  The Plaintiffs also challenge the constitutionality of Canon 3E(1), which provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." The Plaintiffs have not asked the Court to preliminarily enjoin enforcement of this provision.

attorney to the CJQ from 1987 to 1992. She is responsible for answering formal and informal inquiries from judges, judicial candidates, and the public and for advising whether a proposed course of conduct would violate the judicial canons. (Babcock Aff. 1, Agreed Ex. 2). The plaintiff judicial candidates have never inquired of Babcock whether answering IRL's questionnaires would violate the judicial canons.

Subsequent to the Supreme Court's decision in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), Babcock drafted, and the CJQ adopted, Preliminary Advisory Opinion #1-02. The opinion explains that "the Commission is compelled to acknowledge that candidates are permitted under the first amendment to state their general views about disputed social and legal issues." (Advisory Op. 2, Agreed Ex. 1.) Although not exhaustive, the commission provides the examples that "[c]andidates have a constitutional right to state their views on, for example, abortion or the death penalty, to characterize themselves as 'conservative' or 'tough on crime,' or to express themselves on any number of other philosophies or perspectives." (*Id.*) The opinion explains that "many issues about campaign speech will require ad hoc analysis" and accordingly advises candidates to contact CJQ for advice prior to making campaign statements. (*Id.* at 1, 2.)

The opinion warns candidates of the ease in which one can inadvertently violate the canons.

> As a judicial candidate makes more specific campaign statements relating to issues which may come before the court beyond, for example, the somewhat amorphous "tough on crime" statement, or broad statements relating to the candidate's position on disputed social and legal issues, the candidate incurs the risk of violating the "commitment" clause and/or the "promises" clause. . . . A statement which appears to constitute a mere expression of fact, such as a candidate's reference to a record of imposing harsh penalties in criminal cases, may be deemed an implied promise of future conduct and, certainly, subjects the candidate to criticism for calling into question his or her ability to rule in each case on the evidence and the law, and not for the purpose of fulfilling a personal predilection. Such a statement will be looked

3

upon by the Commission with disfavor, as it likely represents a bias against criminal
defendants who later may appear before the candidate.

(*Id.* at 3.) CJQ believes that some philosophical expressions fall between an impermissible

pledge and a proper statement about the best way to approach a social problem, such as the

statement that "all drunk drivers should spend some time in jail." (*Id.*) Such a statement may

require recusal. (*Id.* at 4.)

Statements of "literal fact" may even violate the canons because they are misleading,

such as when a challenger criticizes an incumbent judge by stating that "hundreds of litigants are

still waiting for their cases to be heard" without regard to the status of the cases when the

incumbent judge presides in a busy court. CJQ views such a statement as inappropriate because

it misleads voters into believing the judge is neglectful. Similarly, a candidate cannot promise to

"return integrity" to the bench or to "change the court to a forum where litigants will be treated

with dignity" unless the statement is based on "objective and demonstrable facts about the

incumbent's qualifications or record." (*Id.* at 5.)

CJQ is unwilling to commit to the position that answering the IRL questionnaires at issue

in this case does not violate the "pledges and promises clause" or the "commits" clause.

(Answers to Pl. Request for Admis., Agreed Ex. 18.)  Nevertheless, CJQ has never threatened or

instituted disciplinary proceedings against candidates who have answered IRL's questionnaires,

nor has it ever investigated or prosecuted a judicial candidate or judge for answering an interest

group questionnaire.


**B.     Indiana Right to Life and the Questionnaires**

IRL was incorporated in Indiana on October 19, 1990. The organization "is a non-profit

4

corporation founded on the belief that human life, at any and every stage of development, is sacred and deserving of respect and protection under law." (Bylaws 1, Agreed Ex. 20.) The organization's purposes "are to promote this concern for the sanctity of human life, to educate the public on the subjects of abortion and euthanasia, and to support legislation and constitutional changes to protect the right to life of all innocent human beings." (*Id.*)

One of the organization's practices is to send questionnaires to candidates for public office, including state judicial candidates, eliciting their views on a number of issues of interest to the group, which it then publishes to its constituency. IRL has sent questionnaires to judicial candidates in 2002, 2004, and 2008. It is the 2008 questionnaire that IRL sent to state judicial candidates that is at the center of this dispute. The questionnaire poses nine propositions to candidates, each prefaced with some brief background or overview of the legal or political issue. Candidates are then to check one of the following: "agree," "disagree," "undecided," "decline," or "refuse to answer." The "decline" response is accompanied by an asterisk with the following statement:

> By declining to answer, I assert that I would have replied to this question but for the prospect that I may be disciplined for doing so under Indiana Judicial Canon 5A(3)(d)(i) and (ii)—which provides that a judicial candidate "shall not: (i) make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; [or] (ii) make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." I also will not answer because doing so could subject me to mandatory recusal as a judge under Canon 3E(1), which requires "A judge [to] disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." My response would neither cause me to be biased for or against parties nor affect my ability to be open-minded with regard to any issue.

(IRL Questionnaire 1–5, Agreed Ex. 9.) A question dealing with the legality of abortion also gives candidates an "other" option, with several lines provided for explaining the respondents'

views. The following are the propositions posed to the candidates:

1.     VALUE OF EARLY HUMAN LIFE . . . I believe that the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development.

2.     LEGAL ABORTION . . .
     a.     I believe that abortion should be permitted only to prevent the death of the mother.
     b.     I believe that abortion should be permitted only to prevent the mother's death, in cases of incest, and in reported cases of forcible rape.
     c.     Other (please explain).

3.     FEDERAL CONSTITUTIONAL RIGHT TO ABORTION . . . I believe that *Roe v. Wade* was wrongly decided.

4.     STATE CONSTITUTIONAL RIGHT TO ABORTION . . . I believe that there is no provision in our current Indiana Constitution which is intended to protect a right to abortion.

5.     STATE RIGHT TO ABORTION FUNDING . . . I believe that *Humphreys v. Clinic for Women* was wrongly decided.

6.     STATE RIGHT TO ASSISTED SUICIDE . . . I believe that there is no provision of the current Indiana Constitution which is intended to protect a right to assisted suicide.

7.     DISPOSITION OF HUMAN BEINGS IN VITRO . . . I believe that human beings whose lives begin by in vitro fertilization or cloning and who exist outside the body of a woman are not personal property and should be treated in accord with their best interests in any dispute over their disposition.

8.     WRONGFUL LIFE . . . I do not believe that a person should be able to sue another because he or she was born alive with a disability rather than aborted.

9.     WRONGFUL BIRTH . . . I believe that *Bader v. Johnson*, 732 N.E.2d 1212 (2002) was wrongly decided.

(*Id.*)

IRL has provided the Court with most (if not all) of the responses it has received for this election cycle's questionnaires. Of the responses provided to the Court, fourteen judicial

6

candidates declined to answer any of the questions, citing the "pledges and promises clause" and the "commits clause" of the Code. Four of those candidates communicated their reason for declining to answer the questions by writing a letter to IRL. The remainder of those candidates checked the "decline" option with the accompanying asterisk that cites to the canons. Seven candidates responded by providing substantive answers to some or all of the questions, although candidates who declined to answer some of the questions cited the canons as their reason for declining. Another candidate checked the "decline" option for all the questions, but he added his belief that *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), was wrongly decided.[2]

This is fairly consistent with previous years. In 2002, nine candidates provided substantive answers to the questionnaires. *Shepard*, 507 F.3d at 547. In 2004, eight candidates responded, but only two provided substantive responses. The remaining six provided a variety of reasons for declining to answer the questions. *Id.*

### C.    Torrey Bauer

Plaintiff Torrey Bauer is an attorney in Kosciusko County, Indiana, and he is running against the incumbent judge of the Kosciusko County Superior Court II in the May 6, 2008, Republican primary. There is no Democrat running for the seat. Bauer is not a member of IRL, although he espouses its beliefs and he is acquainted with the director of the Kosciusko County Right to Life chapter of IRL.

When Bauer received the questionnaire from IRL, he was aware of the Supreme Court's

---

[2]   The questionnaires in which candidates provided substantive responses where filed with the Court under seal. IRL has represented to the Court that it will be publishing the questionnaires immediately once enforcement of the disputed canons is enjoined. The Court will therefore be unsealing these questionnaires.

*White* decision, and he was aware that Judge Allen Sharp had previously enjoined the enforcement of the provisions of the Code at issue in this case. He was not aware that the injunction had been vacated by the Court of Appeals for the Seventh Circuit. He did not contact anyone for advice prior to answering the questionnaire, including Meg Babcock of the CJQ, the official responsible for giving compliance advice. Instead, he considered the relevant case law and judicial canons and determined that answering the questionnaire was permissible.

Bauer learned that Judge Sharp's injunction was no longer in effect when he contacted IRL inquiring as to why his questionnaire had not been published. IRL informed him that the injunction was no longer in effect and that they would not be publishing the questionnaires for fear of subjecting those who provided substantive responses to sanction by the CJQ or IDC. Bauer would have answered the questions regardless of whether there was an injunction in effect, but he now fears that if the relevant disciplinary agencies decide to strictly construe the judicial canons, he could be subject to disciplinary proceedings.

**D.     Judge David Certo**

Judge David Certo is a Marion County Superior Court judge in Marion County, Indiana. He was appointed by Governor Mitch Daniels to fill a vacancy in that court effective August 1, 2007, and he is now up for election for the first time. Marion County, according to the testimony during the preliminary injunction hearing, has an uncommon process for choosing judicial candidates. In November, voters will need to fill sixteen judicial positions in the general election. For the May primary, the Republicans held a convention to choose a slate of eight judges out of the thirteen Republican candidates who aspired to seek the positions. The Democrats followed

the same, or a substantially similar procedure. Accordingly, in the general election, there will be eight Republican candidates and eight Democratic candidates to occupy the sixteen positions. Because of the slating, Judge Certo cannot lose in the May primary. There is a theoretical possibility that he might not win in the November general election (someone might be able to run as an independent), but he acknowledges that is unlikely.

Judge Certo also received a questionnaire from IRL, and he would have preferred to provide substantive answers to it. He has been active in civil and social organizations for nineteen years before taking the bench, including volunteering with various "right to life" organizations, and he believes that stating his opinions on the issues in the questionnaire would allow him to communicate directly with the like-minded voters who would support his candidacy. When he received the questionnaire, he considered providing substantive answers, but he was unsure whether he was permitted to answer under the judicial canons. He sought legal advice from James Bopp, the attorney representing him in this case. He did not seek counsel from Meg Babcock, at least in part because he does not believe she is empowered to give legal advice.

After consulting with his attorney, Judge Certo decided he could not answer the questionnaire. The first reason he could not answer the questionnaire was because he believes the applicable judicial canons proscribe him from providing truly responsive and substantive answers. Based on this interpretation of the canons, he was deterred from answering in part because doing so might subject him to disciplinary proceedings. Second, even if the relevant disciplinary bodies do not sanction him for answering the questionnaire, he does not believe a good judge violates ethical canons just because they are not enforced, and he wants to be a good

judge and he wants the public to view him as a good judge.

## PROCEDURAL BACKGROUND

On September 29, 2004, IRL and two other plaintiffs (who were not judicial candidates) sued members of the CJQ and IDC in this district seeking declaratory and injunctive relief, challenging the same provisions of the Code as are being challenged here. Judge Sharp denied the plaintiffs' request for a preliminary injunction, but he ultimately permanently enjoined enforcement of the "pledges and promises clause" and the "commits clause." He denied the plaintiffs' request for a permanent injunction with respect to the recusal canon. The defendants appealed, and the Seventh Circuit reversed, holding that the plaintiffs lacked standing to assert a First Amendment claim because they lacked sufficient evidence of willing speakers.

IRL filed suit against the same defendants in this district again on April 18, 2008, this time along with two judicial candidates, or "willing speakers." The case was assigned to Chief Judge Miller, who recused himself on April 22, 2008, because his wife is subject to the canons at issue in this case. The case was reassigned to the undersigned that same day.

On April 23, 2008, the Defendants having been notified of the Plaintiffs' request for a temporary restraining order, the Court notified the parties that the Plaintiffs' request would be construed as a request for a preliminary injunction. The Defendants responded in opposition to the Plaintiffs' request on April 29, 2008. The Court held a hearing on April 30, 2008, and allowed the parties to present evidence and argument with respect to the request for a preliminary injunction. The parties were advised that the Court would issue its order and written opinion as early in the day as possible on May 6, 2008, the day of the Indiana primary election.

10

The Plaintiffs advised the Court that they planned to publish the questionnaires immediately to their constituency via the internet should the Court grant their request for a preliminary injunction.

## ANALYSIS

**A.     Justiciability**

Before the Court can approach the merits of whether the Code provisions should be enjoined, the Court must first satisfy itself that it has jurisdiction to hear the case at all. *See State of Ill. v. City of Chi.*, 137 F.3d 474, 479 (7th Cir. 1998) ("[A] court is not free to decide the merits when there is no justiciable controversy. Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further.").

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).

> Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Flast v. Cohen*, 392 U.S. 83, 94–95 (1968). Justiciability requires, among other things, that the case or controversy be brought by parties with a sufficiently personal stake in the outcome (parties with "standing"), *see Allen*, 468 U.S. at 750 (1984), and not be contingent upon future events that may not occur as anticipated or at all (a case that is "ripe"), *see Texas v. United States*, 523 U.S. 296, 300 (1998). The Plaintiffs, at this juncture, have adequately demonstrated

11

that they have standing to bring this suit and that the case is ripe for adjudication.

**1.** *Standing*

The requirement that plaintiffs have standing to bring a case entails both constitutional and prudential limitations on the exercise of federal jurisdiction. As for the constitutional component, Article III requires that, at a minimum, the plaintiff make the following three showings:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations, quotation marks, ellipses, and brackets omitted). The requirement that the injury be particularized means that "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1.

In addition to these constitutional requirements, plaintiffs must meet prudential standing requirements, "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen*, 468 U.S. at 751. The prudential standing requirements have not been exhaustively defined, *see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), but they encompass "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751. As for the prohibition on raising another's rights, in the context

12

of the First Amendment, there are "other concerns that justify a lessening of prudential limitations on standing." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

The party invoking federal jurisdiction bears both the burden of production and persuasion as to all these elements. *See Lujan*, 504 U.S. at 561.

    (a)  *IRL's Standing*

The First Amendment, applicable to the states through the Fourteenth Amendment, *see Schneider v. State*, 308 U.S. 147, 160 (1939), provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. In order for there to be First Amendment protection, there must be a willing speaker. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). "[W]here a speaker exists . . . the protection is afforded . . . to the communication, to its source and to its recipients both." *Id.* This forms the basis for a "right to listen" claim such as the one asserted here by IRL.

In the previous suit that IRL brought in this district, IRL advanced a right to listen theory, but it lacked sufficient evidence of a judicial candidate who wished to answer its questionnaire but did not do so because of the judicial canons. Two judicial candidates answered the questionnaire and did not fear any disciplinary action. Six others declined to answer the questionnaire, but they did so for reasons other than the canons. The final candidate originally stated that he declined to answer because of the canons, but he later acknowledged that he was unwilling to answer the questionnaire regardless of the canons. The Seventh Circuit acknowledged, [i]n a right-to-listen case, . . . [IRL] would have standing if there are otherwise

willing speakers who are constrained by the Judicial Code." *Shepard*, 507 F.3d 545. IRL has returned to the Court with two willing speakers and thus has remedied its standing problem.

IRL has demonstrated its desire to learn of Judge Certo's views on a variety of issues that are of interest to the organization. Judge Certo says that but for the Code provisions at issue in this case, he would share his views with IRL. IRL has therefore established an injury in that its "right to listen" has been infringed, and it has shown that the infringement is caused by the canons.[3] If IRL prevails on the merits, then the canons will be enjoined, Judge Certo will share his views with IRL, and IRL's injury will be redressed. IRL is asserting its own right to listen, and there are no other prudential standing concerns precluding jurisdiction.

(b)  *Judge Certo's Standing*

Judge Certo likewise meets the constitutional and prudential standing requirements. He wishes to exercise his First Amendment right to discuss issues of interest to IRL by answering its questionnaire, but he is afraid to do so for fear that he would be violating the judicial canons and be subject to sanctions.[4] His speech has been chilled, and he has therefore suffered a concrete, particular, and actual injury. His speech has been chilled by the canons, so it is fair to say the canons have caused his injury. Finally, enjoining the canons would free him to speak, and thus would redress his injuries.

---

[3]  Whether this infringement is wrongful will be determined when this case is decided on the merits.

[4]  The determination of whether this fear is reasonable is relevant in deciding both whether Judge Certo has demonstrated an injury for standing purposes as well as whether the issue is ripe for adjudication. For the sake of brevity, and because the analysis is the same as to both concerns, the Court will discuss the reasonableness of Judge Certo's fear in its ripeness analysis.

14

(c)  *Torrey Bauer's Standing*

Plaintiff Torrey Bauer's standing is less obvious. Bauer concedes that the canons have not deterred him from speaking, nor will they in the future, although they do make him anxious about the possibility that the disciplinary commission might sanction him. He answered every question on the questionnaire and returned it to IRL. Granted, when he completed the questionnaire, he did so under the mistaken belief that Judge Sharp's injunction was still in effect. But Bauer testified that, even knowing what he knows now, he would still answer the questions if he had it to do all over again. He even went so far as to say that he would complete the questionnaire even if the disciplinary commission began strictly construing the canons and more vigorously enforcing them. This is distinct from the more typical pre-enforcement cases where plaintiffs seek an injunction because the fear of enforcement deters them from speaking.

Nonetheless, Bauer was counting on IRL to disseminate his answers to IRL supporters, thus educating a larger portion of the electorate about his beliefs than he is able to do himself. Because IRL is concerned with the commission's enforcement of the canons against those judges and judicial candidates willing to answer the questionnaires, it will not publish any candidate's questionnaire. That goes for even candidates such as Bauer who are willing to take their chances with the disciplinary commission.

Bauer therefore demonstrates two injuries that confer standing. His first injury is his fear of sanction by the disciplinary commission for answering the questionnaire, and his second is the chilling effect the canons have had on IRL's willingness to distribute Bauer's speech.

15

i.  Fear of Sanction

With respect to the Article III standing requirement of an injury in fact, that injury must be "actual or *threatened.*" *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979) (emphasis added). If a state does not suggest that a law will not be enforced, there is no reason for a federal court to assume otherwise. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (recognizing plaintiffs had standing in preenforcement facial challenge to a statute that had yet to become effective). "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal citations, brackets, and quotations marks omitted).

"[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of hypothetical—provided of course that the relief sought would, if granted, reduce the probability." *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993). On the other hand, "Article III . . . bars a federal court from enjoining threatened action that the plaintiff has no reason to suppose even remotely likely ever to materialize." *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004). A plaintiff need only demonstrate "an actual and well-founded fear that the law will be enforced against them." *American Booksellers*, 484 U.S. at 394.

While Bauer has not (at this point) demonstrated that it is *probable*—in the sense that it is more likely than not—that the judicial canons will be interpreted and enforced in a manner that will subject him to disciplinary proceedings, he has demonstrated an actual and well-founded fear that his speech will subject him to sanction. CJQ's advisory opinion does not make it clear

16

whether answering the questionnaires violates the "pledges and promises clause" or the "commits clause." The reasonableness of Bauer's belief that the commission might interpret answering the questionnaires to violate the clauses is demonstrated by the Defendants' refusal, up to this point at least, to concede that it does not.

This is not a case where everyone concedes that Bauer's interpretation of the canons would render them unconstitutional. *Cf. Lawson*, 368 F.3d at 957 (involving case where there was no dispute that Indiana's flag desecration statute was unconstitutional); *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183 (7th Cir. 1998) (no indication Wisconsin would enforce campaign finance law in a manner inconsistent with *Buckley v. Valeo*, 424 U.S. 1 (1976)). Rather, the Defendants have defended the constitutionality of the disputed judicial canons even when construed as Bauer believes they reasonably can be, *see Shepard*, 463 F. Supp. 2d 889–90. Consistent with the refusal to take the position that answering IRL's questionnaire does not constitute a violation of the canons, the Defendants do not suggest that the state will never enforce the judicial canons as Bauer fears they might, and this Court will not suppose otherwise.

Bauer has demonstrated an injury in fact, that injury being that he reasonably fears the judicial canons will be enforced to sanction his responses to IRL's questionnaire. That injury is caused by the canons at issue, and enjoining the canons will certainly redress that injury.

ii.  Interference with the Dissemination of Bauer's Speech

The fact that the canons have deterred IRL from disseminating Bauer's speech also constitutes a concrete, particular, and actual harm to Bauer. His injury is concrete in that his speech has been prevented from reaching an audience that would otherwise receive it were it not

for the canons. The injury is particular, as the canons only inhibit the speech of Bauer and similarly situated judicial candidates. The injury is actual because the infringement has already and continues to occur.

One could argue that Bauer's injury is only contingent upon IRL's independent decision not to publish the questionnaires (After all, IRL is not subject to the judicial canons.). This goes to the causation and redressability arguments. The argument would be that it is not the judicial canons that have caused Bauer's speech to be suppressed, but rather it is IRL's own independent refusal to distribute Bauer's speech. Similarly, even if an injunction is issued, IRL could also decide for some other reason not to disseminate the questionnaires. An analogous problem arose in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

*Lujan* involved a challenge to the Department of the Interior's interpretation of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* One provision at issue instructed "the Secretary of the Interior to promulgate by regulation a list of those species which are either endangered or threatened under enumerated criteria, and to define the critical habitat of these species." *Lujan*, 504 U.S. at 558. The act further required that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical.

*Id.* at 558. The Department of the Interior eventually interpreted this to require consultation only for actions taken in the United States or on the high seas. This prompted "organizations dedicated to wildlife conservation and other environmental causes" to seek a declaratory judgment that the interpretation was in error and an injunction requiring a new interpretation that

the act applied to actions taken by agencies abroad. The Supreme Court held that the plaintiffs

had not demonstrated a sufficient injury, and they therefore lacked standing. *Id.* at 563.

A plurality of the Court went further and also concluded that the plaintiffs lacked

standing on redressability grounds. This was in part because agencies only supply a fraction of

funding for foreign projects. *Id.* at 571. The plurality concluded that this meant it was "entirely

conjectural whether the nonagency activity that affects respondents will be altered or affected by

the agency activity they seek to achieve." *Id.* In other words, even if the agencies abstained from

participating in any projects that caused environmental degradation, the funding recipients might

carry on with the projects nonetheless, causing the plaintiffs' injuries to remain.

There is no such redressability problem here. IRL has consistently represented to the

Court throughout its briefings and oral arguments that the only thing preventing it from

publishing the questionnaires is the prospect that disciplinary proceedings will be initiated

against judicial candidates who responded. There is no reason to doubt this representation,

particularly since the distribution of these questionnaires is a significant part of IRL's core

mission. Anticipating that IRL might not publish the questionnaires calls for a greater degree of

speculation than does the expectation that they will publish them.

On the issues of causation and redressability, Bauer's situation is more analogous to that

of the plaintiffs in the right to listen case discussed earlier, *Virginia State Board of Pharmacy v.

Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). In that case, Virginia had

passed a statute that provided that a licensed pharmacist was guilty of unprofessional conduct if

he advertised prescription drug prices. The statute only applied to licensed pharmacists, but the

"attack on the statute . . . [was] made not by one directly subject to its prohibition, that is, a

19

pharmacist, but by prescription drug consumers who claim they would greatly benefit if the prohibition were lifted and advertising freely allowed." *Id.* at 753. The plaintiffs prevailed in that case, and the Supreme Court held that the statute violated the First Amendment.

The Supreme Court did not explicitly discuss the issues of causation and redressability (the standing discussion was focused on the injury element), although it did find that the plaintiffs had standing. *Id.* at 756–57. As for causation, "the appellees could both receive and publish the information in question." *Id.* at 782 (Rehnquist, J., dissenting). Nonetheless, they had standing "to protest that pharmacists [were] not allowed to advertise." *Id.* The Virginia statute did not directly prevent the plaintiffs from receiving drug prices. They could visit various pharmacies, compare the prices, and even publish the comparisons if they desired. Pharmacists, in an effort to comply with the statute, refused to distribute the information themselves, sometimes going beyond what the enforcement body stated was necessary to be in compliance. *Id.* at 752. ("Some pharmacies refuse even to quote prescription drug prices over the telephone. The Board's position, however, is that this would not constitute an unprofessional publication.")

Like the Virginian consumers, Bauer is not prevented from receiving or publishing information (unlike Judge Certo, the canons have not prevented Bauer from expressing his views), but the canons are preventing the dissemination of information (Bauer's views on political and legal issues) by a group that wishes to circulate his speech. Bauer's speech would certainly reach a larger portion of the electorate if the canons were not deterring IRL from publishing the questionnaires, just as drug prices would be more widely distributed if

20

pharmacists could advertise them.[5] Broader distribution of information is crucial in both

contexts. Increased advertising of prices leads to lower drug costs, and wider distribution of

political views leads to a more informed citizenry.

There is at least one important distinction between the Virginia pharmacy case and this

case regarding causation. There, the pharmacists refused to publish drug prices because they

themselves were subject to sanction. Here, IRL is not subject to sanction; rather it is refusing to

publish questionnaires because it fears that the judicial candidates who answered them will be

subject to sanction. This would be analogous to a pharmacy refusing to advertise prices for fear

that some of its pharmacists would be subject to sanction, even if other pharmacists were willing

to take the risk. In that case, as here, the cause would be proximate enough to confer standing.

As for redressability, invalidating the Virginia statute did not logically necessitate the

conclusion that the pharmacists would choose to start advertising drug prices. As then-Justice

Rehnquist pointed out in dissent, "[h]ere the only group truly restricted by this statute, the

pharmacists, have not even troubled to join in this litigation and may well feel that the expense

and competition of advertising is not in their interest." *Id.* at 783 (Rehnquist, J., dissenting).

Similarly, it is possible in this case that IRL would choose not to publish the questionnaires even

after the canons were enjoined, just as it was possible that Virginia pharmacists would not

advertise drug prices even if they were allowed to do so. The realities of the marketplace made it

highly unlikely that pharmacists would not advertise, so causation and redressability really

---

[5]   Bauer did testify that to some extent, he wants to conserve his resources by having IRL spread his views
rather than having to devote more of his own time and money. This does not preclude standing. First, requiring him
to expend more resources constitutes an injury caused by the canons that would be redressed through an injunction.
Second, even if he was willing to spend as much time and money as he has to capture as wide an audience as he is
capable of, it is highly unlikely that his efforts would overlap exactly with IRL's network of constituents.

presented no issue. Similarly, a significant part of IRL's mission is to publish questionnaires like those at issue, and the Court has no reason to doubt that the only thing holding it back is its fear that publication will subject respondents to sanction by the disciplinary commission.

This analysis is consistent with a helpful hypothetical the Seventh Circuit posed in *Majors v. Abell*, 317 F.3d 719, 722 (2003). Plaintiffs in that case challenged an Indiana statute that required certain types of political advertising to identify who paid for the communication. The court observed that one might question whether a candidate has standing to challenge the statute since he would have no interest in anonymity, given that there is no such thing as an anonymous candidate. However, candidates are injured by such a regulation because the loss of anonymity might deter supporters from promoting the candidate through paid advertising. The court concluded that "a plaintiff who is harmed by the infringement of another person's right of free speech has standing to challenge that infringement."  *Id.* That is the case here. Bauer is harmed not only by the alleged harm to his own constitutional rights, but by the alleged infringement of IRL's rights as well.

Bauer's standing becomes clear when considered in light of the constitutional and judicial policies that given rise to the justiciability doctrines. There is a live controversy. Bauer has expressed his views on important legal and political issues and he has IRL as a vehicle for expressing those views. IRL has a website and email distribution list ready to spread those views immediately after the canons are enjoined. Bauer is not merely advancing the rights of others or expressing a generalized grievance, and the question of whether the canons violate the First Amendment is a question fit for judicial resolution.

2.    *Ripeness*

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hospitality Ass's v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). Ripeness is related to standing in that "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Employees Union v.United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996). "The difference between an abstract question calling for an advisory opinion and a ripe 'case or controversy' is one of degree, not discernible by any precise test." *Wis.'s Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410 (7th Cir. 1984) (citing *Babbitt*, 442 U.S. at 297).

"A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." *Majors*, 317 F.3d at 722 (internal citations omitted). To demonstrate ripeness in a pre-enforcement challenge, a plaintiff must show that the issues are fit for judicial decision and that the plaintiff will suffer a hardship if the court withholds consideration. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 882 (2003). Hardship is established if (1) enforcement is certain, only delayed, or, (2) even if the enforcement is not certain, the mere threat of future enforcement has a present concrete effect and a later challenge will cause irremediably adverse consequences. *Id.*

The issue in this case, the consequence of applying the First Amendment to the relevant judicial canons, is fit for judicial decision. As Bauer and Judge Certo demonstrated through their

23

testimony, it is of no consequence for justiciability purposes that they have not been threatened with prosecution. The threat is latent in the judicial canons. Judge Certo, and apparently other judicial candidates, are unwilling to answer the questionnaires as a result of the canons. Bauer is continuously anxious that the IDC may change course and decide to sanction his decision to answer the questionnaires. The Plaintiffs have not yet demonstrated that enforcement is certain, only delayed. But alternatively, given that the interference with First Amendment speech is an irreparable harm, they have shown that later consideration will cause irremediably adverse harm.

Of particular consequence to the Court in deciding the ripeness issue at this point is the fact that this case is quite different than those of the *Lawson v. Hill* species. At issue in *Lawson* was a statute that prohibited flag desecration that had no realistic threat of enforcement but was merely languishing on the books because there was no legislative incentive to remove it. *Lawson*, 368 F.3d at 958 (answering no to the questions: "Do state legislatures have a duty to conform their statute books to authoritative judicial interpretations? . . . [S]hould every state have been obliged, on pain of seeing its prosecutors enjoined, to rewrite its flag-desecration statute to create an express privilege for the conduct held privileged in those cases?") The desecration statute drew little or no attention from the public and posed no realistic threat of enforcement. The "pledges and promises clause" and the "commits clause," on the other hand, remain of enormous importance to state judges in Indiana, as evidenced by the fifty-plus pages of emails from CJQ responding to judges' requests for guidance as to how to comply with the provisions. (Agreed Ex. 3.)

The Defendants argue that the Court must find that the issue lacks ripeness because they believe the Seventh Circuit decided the ripeness issue when it vacated the previous injunction.

24

They argue that injunction was vacated both because the plaintiffs lacked standing and because the issue was not ripe. There are some indications in the Seventh Circuit opinion that the holding was based in part on ripeness, but the Court finds that the previous injunction was vacated because they plaintiffs lacked standing, not because the issue lacked ripeness.

The Seventh Circuit's justiciability discussion consists of five paragraphs. *Shepard*, 507 F.3d 549. The discussion begins by explaining the relationship between standing and ripeness in the first paragraph. *Id.* The next three paragraphs, the second through the fourth, discuss standing exclusively. *Id.* at 549–550. The fourth paragraph ends by stating the holding: "Right to Life has failed to establish standing to bring this action." The fifth and final paragraph begins by observing, "[o]ur decision is in line with the previously mentioned decisions of the Courts of Appeals for the Third Circuit and the Ninth Circuit." *Id.* at 550.

The Third Circuit decision, *Pennsylvania Family Institute, Inc. v. Black*, 489 F.3d 156 (3rd Cir. 2007), addressed standing. The Ninth Circuit decision was *Alaska Right to Life v. Feldman*, 504 F.3d 840 (9th Cir. 2007). The court explained: "In *Alaska Right to Life*, the court looked at ripeness. As here, there was no evidence of a real threat of enforcement; accordingly the case was not ripe." *Shepard*, 507 F.3d at 550. Referring again to both the Third Circuit decision, which dealt with standing, and the Ninth Circuit decision, which dealt with ripeness, Judge Evans observed that "[l]ike those cases, the case before us does not present a case or controversy." *Id.* The opinion concludes by again stating the holding: "Right to Life has no standing to bring the case, and it should have been dismissed." *Id.*

The Defendants' reading of the opinion is a fair one. They focus on the language that there is no real threat of enforcement and conclude that the Seventh Circuit was saying that, like

*Alaska Right to Life*, the case before it was not ripe. But the better reading, given the entire context of the opinion, is that the Seventh Circuit was saying that the case was similar to *Alaska Right to Life* in that there more generally was no case or controversy, not that the cases were similar because more specifically they were not ripe. This reading is supported by the fact that in each instance where the court stated its holding, it only mentioned standing.

This interpretation is further supported by the fact that the Ninth and Seventh Circuits have different requirements for evaluating the ripeness of pre-enforcement challenges. The Ninth Circuit requires three showings: (1) the plaintiff must articulate a concrete plan to violate the law in question; (2) the prosecuting authorities must have communicated a specific warning or threat to initiate proceedings; and (3) there must be a history of past prosecution or enforcement under the challenged statute. *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003). The Seventh Circuit does not require any of these showings. *See Majors*, 317 F.3d at 722 ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him . . . .")

The Court finds that the Seventh Circuit vacated the previous injunction because the plaintiffs lacked standing, not because the issue lacked ripeness. The Court further finds that Plaintiffs have made a sufficient showing at this point in the case that the issue is ripe for judicial determination.

**3.**     ***Comity***

The Defendants also cite *Lawson v. Hill* for the proposition that "principles of comity require federal courts to forbear where a State official has not threatened a particular application

of a law and Supreme Court precedent plainly *bears* on the hypothetical challenged application."
(Mem. in Opp. 11, DE 16) (emphasis added). But in *Lawson* the Supreme Court precedent had
more than just a bearing on the statute; there was no dispute that the relevant precedent rendered
the Indiana statute unconstitutional. The only way a prosecutor would pursue a prosecution
under the statute would be if he was "ignorant of the relevant constitutional law or, more likely,
might see an opportunity to reap political gains from prosecuting people whose conduct though
lawful had outraged the community." *Lawson*, 368 F.3d 955. In this case it would be fair to say
that the relevant Supreme Court precedent bears on the hypothetical question, but there is a
genuine dispute as to the implications of that precedent for the canons at issue.

The Defendants contend that an injunction can only be based on a distrust of the probity
and professionalism of the defendant state officials. The Court harbors no such distrust. Rather,
at this juncture it appears there is a good faith dispute between the parties as to how the canons
are to be interpreted and whether the canons violate the First Amendment as interpreted by
recent Supreme Court precedent.

There has not been a sufficient showing at this point that abstention from deciding the
case is warranted based on the traditional comity considerations.

> [F]ederal courts have the power to refrain from hearing cases that would interfere
> with a pending state criminal proceeding, or with certain types of state civil
> proceedings; cases in which the resolution of a federal constitutional question might
> be obviated if the state courts were given the opportunity to interpret ambiguous state
> law; cases raising issues "intimately involved with [the States'] sovereign
> prerogative," the proper adjudication of which might be impaired by unsettled
> questions of state law; cases whose resolution by a federal court might unnecessarily
> interfere with a state system for the collection of taxes; and cases which are
> duplicative of a pending state proceeding.

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–17 (1996) (internal citations omitted). The

Defendants' comity arguments seem to be directed at *Pullman* type abstention. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). "*Pullman* abstention is warranted only when (1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Int'l Coll. of Surgeons v. City of Chi.*, 153 F.3d 356, 365 (7th Cir. 1998). The doctrine of abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). The Court cannot abstain at this point without more focused and developed argument.

**B.     Preliminary Injunction Factors**

In order to obtain a preliminary injunction, the Plaintiffs must make four threshold showings. First, they are reasonably likely to succeed on the merits. *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Second, they will suffer irreparable harm that outweighs the harm that the nonmoving parties will suffer if the injunction is granted. *Id.* Third, there is no adequate remedy at law. *Id.* Fourth, an injunction will not harm the public interest. *Id.* If the Plaintiffs meet this threshold burden, the Court must weigh the factors against one another in a sliding scale analysis, which is to say the Court "must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." *Id.* (internal citation omitted).

For reasons the Court will next explain, the Plaintiffs have met their burden on each

28

element, and the Court will preliminarily enjoin enforcement of the "pledges and promises

clause" and the "commits clause."

**1.      *Likelihood of Success on the Merits***

The Court must take two passes at evaluating the Plaintiffs' likelihood of success on the

merits.

> In the first phase of the analysis, the court decides only whether the plaintiff has any
> likelihood of success—in other words, a greater than negligible chance of
> winning—but in the second phase, the court evaluates that likelihood of success as
> the analysis turns to a "sliding scale" under which a lesser likelihood of success can
> be made sufficient by a greater predominance of the balance of harms. In performing
> this balancing, the court bears in mind that the purpose of a preliminary injunction
> is to minimize the hardship to the parties pending the ultimate resolution of the
> lawsuit.

*AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (internal

citations and quotation marks omitted). "[T]he granting of a preliminary injunction is not a

decision on the merits of the plaintiff's suit." *Ayres v. City of Chi.*, 125 F.3d 1010, 1013 (7th Cir.

1997). Rather, such a decision reflects a determination that "the suit has enough merit—which

need not be great—to justify an order that will freeze the situation, in the plaintiff's favor, for

such time as it may take to determine whether the suit is, or is not, meritorious." *Id.*

"This case represents a perplexing intersection of an important state interest and a

fundamental constitutional right: the interests of the state to ensure impartiality in the judiciary

and the First Amendment rights of judicial candidates to express their opinions on legal issues,

as well as the rights of voters to hear such information." *Family Trust Foundation of Ky., Inc. v.

Wolnitzek*, 345 F. Supp. 2d 672, 694 (E.D. Ky. 2004). *Wolnitzek*, 345 F. Supp. 2d at 694.

Ultimately, to receive the declaratory and permanent injunctive relief they seek, the Plaintiffs

must demonstrate that the Defendants' means of protecting the state's interest does not adequately accommodate the First Amendment rights of judicial candidates and voters. The Plaintiffs certainly have demonstrated a greater than negligible chance of making such a showing and prevailing on the merits, most convincingly by repeatedly prevailing on the merits in this and other districts. *See Shepard*, 463 F. Supp. 2d 879, *rev'd on other grounds by Shepard*, 507 F.3d 545; *Pa. Family Inst., Inc. v. Celluci*, 489 F. Supp. 2d 447, 459–60 (E.D. Pa. 2007), *vacated by Pa. Family Inst., Inc. v. Celluci*, 521 F. Supp. 2d 351, 388 (E.D. Pa. 2007) (narrowly construing canon "to keep it from being held unconstitutional under the First Amendment"); *Kansas Judicial Watch v. Stout*, 440 F. Supp. 2d 1209 (D. Kan. 2006), *vacated in part on other grounds by Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1122 (10th Cir. 2008); *Alaska Right to Life Political Action Comm. v. Feldman*, 380 F. Supp. 2d 1080 (D. Alaska 2005), *rev'd on other grounds by Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 853 (9th Cir. 2007); *Family Trust Foundation of Ky., Inc. v. Wolnitzek*, 345 F. Supp. 2d 672, 711–12 (E.D. Ky. 2004).   Indeed, it would be quite odd to say that the Plaintiff, having prevailed on the merits once before in this district, with nothing of legal significance occurring in the interim, no longer has any real likelihood of prevailing on the merits.

One federal district court and two state supreme courts have upheld provisions identical to those at issue here in other state judicial codes. However, those courts have always first narrowly construed the provisions, sometimes explicitly to avoid constitutional issues. *See Celluci*, 521 F. Supp. 2d 351, 375 ("Controlling Third Circuit and Supreme Court case law . . . requires this court to determine whether the pledges and promises and commits clauses are reasonably susceptible to Defendant's proffered narrow construction, and if, if so, whether it

saves those clauses from unconstitutionality."); *In re Watson*, 794 N.E.2d 1, 6 (N.Y. 2003) ("restriction is not a blanket ban on pledges or promises; a judicial candidate may promise future conduct provided such conduct is not inconsistent with the faithful and impartial performance of judicial duties"); *In re Kinsey*, 842 So. 2d 77, 89 (Fla. 2003) (limited to a candidate who has "promised favorable treatment for certain *parties and witnesses* who would be appearing before her"). Unlike in *Celluci*, the Defendants here have not yet offered a narrow construction of the disputed clauses, perhaps because they believe such narrowing is unnecessary. The record is not yet sufficiently developed to evaluate whether such an approach is a tenable option, and this possibility does not serve to mitigate the *ex ante* evaluation of the Plaintiffs' likelihood of success on the merits.

The Defendants argue that the Plaintiffs are unlikely to succeed on the merits because the Due Process Clause requires states to maintain an unbiased and impartial judiciary. In the end, that argument may very well carry the day. But so too might the Plaintiffs' argument, as it has in the previously referenced opinions from other courts. The question at this juncture is whether the Plaintiffs have a more than negligible chance of prevailing on the merits, and, if so, whether that likelihood is sufficient, in light of all the other preliminary injunction factors, to justify the Court exercising its discretion to use its equitable power to enjoin the enforcement of the disputed provisions. Several courts, including a court of this district, have found that the "pledges and promises clause" and the "commits clause" are not a narrowly tailored means to serve a compelling state interest as required by the Supreme Court in *White*. The reasoning of those courts, and the dearth of opinions holding the contrary, is enough at this juncture to enable the Plaintiffs to make an adequate showing that their likelihood of success on the merits is sufficient

31

to support the Court's issuance of a preliminary injunction, which is not a decision on the merits and does not require the same detailed analysis.

The parties' counsel have quite ably argued their positions in the briefs and during the preliminary injunction hearing with respect to the more precise form a First Amendment analysis should take in light of the relevant caselaw, particularly *White* and *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224, 231 (7th Cir. 1993). The Court avoids a more detailed analysis in this opinion because, the Plaintiffs already having established a sufficient likelihood of success through prevailing in other similar cases, it is prudent for the Court to withhold a more thorough discussion of the underlying merits until the parties have briefed the issue at the summary judgment stage. At that stage the argument will be more narrowly focused on the First Amendment issues as opposed to these proceedings, where the First Amendment analysis serves as only one element in the preliminary injunction determination.

### 2.    *Irreparable Harm*

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Plaintiffs have met their burden of demonstrating that their protected speech will be curtailed if the preliminary injunction is not issued. Judge Certo is unwilling to answer the questionnaires without it, which means his speech is curtailed through his fear of disciplinary proceedings. IRL's right to receive Judge Certo's speech is therefore inhibited as well. Bauer also fears the possibility that disciplinary proceedings will be initiated because he answered the questionnaires, and he is not able to communicate his speech to a portion of the electorate because the disputed

32

provisions of the judicial canons are preventing IRL from publishing Bauer's responses.

The Defendants opined in their memorandum that the Plaintiffs were not really asking for just an injunction, but rather they wanted their behavior immunized during the pendency of the injunction. The Plaintiffs adequately dispelled that suspicion at the preliminary injunction hearing when they represented to the Court that "if there is some uncertainty on whether or not we will ultimately be protected, we're ready to take the chance." They added that if the Court denies a permanent injunction and the judicial candidates' responses are not protected, "[t]hat's a risk [they]'re prepared to bear."

The Defendants make two arguments related to timing. The first is that because Bauer already answered the questionnaire and Judge Certo is unopposed, nobody is currently being harmed by the judicial canons. The second argument is that the May primary cannot justify a preliminary injunction. As for the first argument, the Court has already explained how the Plaintiffs have demonstrated injury and irreparable harm. As for the second argument, the cases to which the Defendants cite involve cases where suit was filed "gratuitously late in the campaign season." *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004); *see also FreeEats.Com, Inc. v. Indiana*, 502 F.3d 590 (7th Cir. 2007). The Court does not find that the Plaintiffs have failed to expeditiously litigate their lawsuit, so it cannot be held against them that the Court is unable to grant them their relief until the day of the primary. The Plaintiffs have also demonstrated that the relief is still important because they can publish the questionnaires to their constituency on election day via the internet, not to mention that the relief will result in the publication of the questionnaires well in advance of the November general election.

Defendants assert an undoubtably legitimate interest in maintaining an impartial

judiciary. With respect to maintaining this impartiality by enforcing the judicial canons to sanction candidates who answer IRL's questionnaire, the Defendants concede "CJQ has shown no interest in such enforcement." As such, any harm to the Defendants resulting from the preliminary injunction does not outweigh the harm to the Plaintiffs, particularly when considered in totality with all the preliminary injunction factors. The preliminary injunction is narrowly tailored to prevent enforcement for answering IRL's questionnaires. The disputed provisions of the judicial canons otherwise remain in effect as a means to maintain impartiality.

**3.**     *Inadequacy of Remedy at Law*

This element is not disputed in this case because of the nature of the constitutional claims. "The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Walker*, 453 F.3d at 859.

**4.**     *Public Interest*

Given that the parties in this case are judicial candidates, a public interest group, and state officials, the public's interests are identical to that of the parties. Like the Plaintiffs, the public has an interest in the free flow of ideas leading to a more informative election process. Like the Defendants, the public has an interest in an impartial judiciary.

**C.**     **Conclusion**

The Court, having considered all the evidence and argument presented by the parties, and

having evaluated and balanced the preliminary injunction factors, finds that the Plaintiffs have shown that a preliminary injunction is warranted in this case. The Plaintiffs have demonstrated a reasonable likelihood of succeeding on the merits and that they will suffer irreparable harm if the injunction is not issued. The harm to the Plaintiffs in denying the request outweighs the harm to the Defendants in granting it.

It is worth emphasizing that at the preliminary injunction stage, the Plaintiffs have not been required to prove their case in full. A preliminary injunction is merely meant to maintain the relative positions of the parties until the case can be resolved on the merits. Accordingly, only the injunction is binding on the parties; the factual and legal conclusions in this opinion are not binding as the case moves forward.

Finally, as some of the other courts that have addressed these questions have observed, the injunction requested by the Plaintiffs merely precludes enforcement of the judicial canons to sanction candidates for answering the IRL questionnaire. The injunction does not require that candidates answer the questionnaire.

**ORDER**

For the reasons stated, the Plaintiffs' request for a preliminary injunction [DE 3] is **GRANTED**. Accordingly, the Commission on Judicial Qualifications and the Indiana Disciplinary Commission are enjoined from initiating disciplinary proceedings under Canon 5A(3)(d)(i) and (ii) against judicial candidates who respond to Indiana Right to Life's Questionnaire until a final decision on the merits. The Clerk is **ORDERED** to unseal Plaintiff's Exhibit 7 to the Complaint [DE 2]. The Plaintiffs are **ORDERED** to post a bond in the amount

of $1.00.

SO ORDERED on May 6, 2008.


 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT