**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| TORREY BAUER, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:08-CV-196-TS |
| | ) | |
| RANDALL T. SHEPARD, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

The people of the State of Indiana through the Indiana Constitution have granted the Indiana Supreme Court authority to regulate the conduct of Indiana lawyers and judges. In exercising this authority, the Indiana Supreme Court has adopted the Indiana Rules of Professional Conduct and the Indiana Code of Judicial Conduct. In adopting these rules of conduct, the court has balanced values important to the administration of justice (such as judicial fairness, impartiality, independence, integrity, and competence, the principles of justice, and the rule of law) against other values (such as the speech rights of judges and judicial candidates). Additionally, in response to decisions by federal courts regarding the constitutionality of various standards governing judicial conduct, the Indiana Supreme Court has amended the Indiana rules, even as recently as within the last year.

In this case, a nonprofit issue advocacy organization, a judge, and an attorney who recently ran for judicial office challenge several rules adopted by the Indiana Supreme Court that govern the conduct of judges and judicial candidates. They argue that these rules unconstitutionally restrict their free speech and association rights in violation of the First Amendment to the Constitution of the United States of America.

This matter is now before the Court for ruling on cross-motions for summary judgment

filed by the parties. Although the parties do not highlight any real dispute over material facts, they do pose one overarching legal question: do certain rules adopted by the Indiana Supreme Court to govern the conduct of judges and candidates for judicial office violate the free speech and association rights of judges and judicial candidates as protected by the First Amendment? For the reasons stated in this Opinion and Order, the Court finds that the rules challenged in this lawsuit do not violate the Plaintiffs' First Amendment speech and association rights.

## PROCEDURAL BACKGROUND

On September 29, 2004, Indiana Right to Life, Inc. (IRL) and two other plaintiffs (who were not judicial candidates) instituted a lawsuit (*Indiana Right to Life, Inc., et al., v. Randall T. Shepard*, Cause Number 4:04-CV-71 (*Shepard I*)) in this judicial district against members of the Indiana Commission on Judicial Qualifications (ICJQ) and the Indiana Disciplinary Commission (IDC), seeking declaratory and injunctive relief, challenging the "pledges or promises clause" and the "commits clause" (Canon 5A(3)(d)(i) and (ii)) and the "recusal requirement" (Canon 3E(1)) of the Indiana Code of Judicial Conduct in effect at that time, and claiming that these provisions might prohibit judicial candidates from responding to an IRL questionnaire. Judge Allen Sharp denied the plaintiffs' request for a preliminary injunction. Ultimately, however, Judge Sharp permanently enjoined enforcement of the "pledges or promises clause" and the "commits clause," but denied the plaintiffs' request for a permanent injunction with respect to the "recusal requirement." *Ind. Right to Life, Inc. v. Shepard*, 463 F. Supp. 2d 879 (N.D. Ind. 2006). The defendants appealed, and the Seventh Circuit reversed, holding that the plaintiffs lacked standing to assert a First Amendment claim because they lacked sufficient evidence of

willing speakers. *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545 (7th Cir. 2007). On January 4, 2008, that case was dismissed.

On April 18, 2008, IRL along with Torrey Bauer, an attorney and (at that time) a candidate for judge of the Kosciusko Superior Court, and Judge David Certo of the Marion Superior Court, instituted this lawsuit against members of the ICJQ and the IDC in their official capacities. The Plaintiffs claimed that provisions of the Code violate their rights under the First and Fourteenth Amendments to the United States Constitution. In their original Verified Complaint for Relief [DE 1], they sought injunctive relief barring enforcement of the "pledges or promises clause" (Canon 5A(3)(d)(i)), the "commits clause" (Canon 5A(3)(d)(ii)), and the "recusal requirement" (Canon 3E(1)) of the Code in effect at that time. In addition to their Complaint, the Plaintiffs filed a Motion for Temporary Restraining Order [DE 3] and a Memorandum in Support [DE 4]. The Court construed the Motion as a request for a preliminary injunction because the Defendants had received notice of the Plaintiffs' request. On April 29, the Defendants filed a Memorandum in Opposition [DE 16]. On April 30, the Court conducted an evidentiary hearing, permitting the parties to present evidence and argument with respect to the request for a preliminary injunction. On May 6, the Court issued an Opinion and Order granting the Plaintiffs' request for a preliminary injunction and enjoining the ICJQ and the IDC from initiating disciplinary proceedings under the "pledges or promises clause" and the "commits clause" (Canon 5A(3)(d)(i) and (ii)) against judicial candidates who respond to the IRL's 2008 questionnaire until the Court issues a final decision on the merits.

On June 5, the Plaintiffs filed a Verified Amended Complaint for Relief [DE 25], in which they continued to challenge the "pledges or promises clause" (Canon 5A(3)(d)(i)), the

"commits clause" (Canon 5A(3)(d)(ii)), and the "recusal requirement" (Canon 3E(1)). However, they added challenges to the "partisan activities clauses" (Canon 5A(1)(a) & (c)) and the "solicitation clauses" (Canon 5A(1)(e) & 5C(2)), as well as Canons 5A(1)(b) and 5C(1)(g). On July 16, the Defendants filed their Answer [DE 29].

On July 28, the Plaintiffs filed a Motion for Summary Judgment [DE 31] and supporting brief [DE 32]. On August 27, the Defendants responded by filing a Motion to Deny Plaintiffs' Motion for Summary Judgment or, Alternatively, to Continue Under Rule 56(f) [DE 33] and Memorandum in Support [DE 34]. On September 8, the Indiana Supreme Court issued a press release indicating its adoption of a new Code of Judicial Conduct (or its amendment of the existing Code), which would go into effect on January 1, 2009, and on September 19, the Indiana Supreme Court issued its Order Amending Code of Judicial Conduct.[1] On September 11, the Plaintiffs filed a Response in Opposition [DE 35] to the Defendants' Motion. On September 25, the Court issued an Opinion and Order granting in part and denying in part the Defendants' Motion to Deny Plaintiffs' Motion for Summary Judgment or, Alternatively, to Continue Under Rule 56(f), and allowing the Defendants to file their Response to the Plaintiffs' Motion for Summary Judgment sixty days after the Plaintiffs respond to the Defendants' discovery requests.

On October 1, Plaintiff Certo filed a Motion for Preliminary Injunction and Temporary Restraining Order [DE 39] and a Memorandum in Support [DE 40]. On October 7, the Court conducted a telephone conference with the parties. During the conference, the Court raised the issue of the new Code adopted by the Indiana Supreme Court, which was to take effect on

---

[1] The Indiana Supreme Court has framed this as both a new Code and an amended Code, but for purposes of this case and the Plaintiffs' constitutional challenges, the label is not critically important. However, what is important to note is the fact that material changes were made to canons and rules challenged in this case.

January 1, 2009. The Plaintiffs expressed their view that the 2009 Code was not substantially different from the pre-2009 Code, that there was no need to amend the Complaint or other submissions based upon the adoption of the new Code, and that their Motion for Summary Judgment was still viable, even as to the 2009 Code. The Defendants urged that relevant provisions of the Code were rewritten, that the 2009 Code renders issues regarding the pre-2009 Code moot, and that these differences have an impact on the Plaintiffs' Motion for Summary Judgment and any ruling the Court would enter on the Plaintiffs' Motion. On October 8, the Court issued an Order setting a discovery and briefing schedule on the Plaintiffs' Motion for Summary Judgment. On October 16, the Defendants filed a Memorandum in Opposition [DE 48] to Plaintiff Certo's Motion for Preliminary Injunction, and on October 21, Plaintiff Certo filed his Reply in Support [DE 50]. On October 22, the Court conducted a hearing on Plaintiff Certo's Motion for Preliminary Injunction. The parties then proceeded with discovery. The Defendants' response to the Plaintiffs' Motion for Summary Judgment was due on March 11, 2009, and the Plaintiffs' reply on April 1, but these deadline were later extended at the parties' request.

On March 23, 2009, the Court entered an Opinion and Order [DE 64] denying without prejudice as moot the Plaintiffs' Motion for Summary Judgment [DE 31] and Motion for Preliminary Injunction and Temporary Restraining Order [DE 39], based upon the Indiana Supreme Court's issuance of the new Code. The Court noted that the pre-2009 version of the Code no longer had legal effect, that the 2009 Code included provisions that corresponded (to some degree or another) to the challenged provisions of the pre-2009 Code, that the Plaintiffs' Verified Amended Complaint for Relief and the other submissions of the parties were based on the pre-2009 version of the Code, and that the parties in their submissions had not adequately

addressed the similarities and differences between the old Code and the new Code. For these reasons, the Court directed the parties to prepare submissions to address the differences between the pre-2009 version and the new Code and the impact (if any) of the differences on the Plaintiffs' constitutional claims. In the interest of consolidating issues addressed in disparate motions, addressing the Plaintiffs' claims based upon the current version of the Code, promoting judicial economy and efficiency, and achieving the orderly disposition of this case, the Court set deadlines for the parties to amend the pleadings and to file and brief any dispositive motions.

On April 6, the Plaintiffs filed a Verified Second Amended Complaint for Relief [DE 67].[2] In this Second Amended Complaint, the Plaintiffs challenge the "pledges, promises, or commitments clauses" (Rules 2.10(B) & 4.1(A)(13)),[3] the "recusal clause" (Rule 2.11(A)), the "partisan activities clauses" (Rules 4.1(A)(1) & (2)), and the "solicitation clauses" (Rules 4.11(A)(4) & (8)) of the 2009 Code. The Plaintiffs ask the Court to declare these provisions of the 2009 Code unconstitutional, as well as Canon 5A(3)(d)(i) and (ii) of the former Code, and to enjoin their enforcement. On April 16, the Defendants filed their Answer [DE 69]. On May 1, the Plaintiffs filed a Motion for Summary Judgment [DE 70] and a Memorandum in Support [DE 71]. Also on May 1, the Defendants filed a Motion for Summary Judgment [DE 72], a Memorandum in Support [DE 73], and a Designation of Evidence and Exhibits in Support [DE

---

[2] The Plaintiffs' Verified Second Amended Complaint for Relief now governs this suit, and the Verified Complaint for Relief and Verified Amended Complaint for Relief are superseded. *See Wellness Cmty-Nat'l v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995) (holding that court's jurisdiction inquiry had to be based on amended complaint only because "it is well established that the amended pleading supersedes the original pleading"); *see also Flannery v. Recording Industry Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004) (noting that "[i]t is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void").

[3] The Verified Second Amended Complaint refers to both Rule 2.10(A)(5) and Rule 2.10(B). No Rule 2.10(A)(5) appears in the 2009 Code, but from their pleading it appears that the Plaintiffs intended to challenge Rule 2.10(B). Thus, the Court will treat the Plaintiffs' references to Rule 2.10(A)(5) as scrivener's errors and construe them as references to Rule 2.10(B), which the parties address in their summary judgment motions.

74]. On May 15, the Plaintiffs filed a Response in Opposition [DE 76] to the Defendants' Motion, and the Defendants filed a Memorandum in Opposition [DE 77] to the Plaintiffs' Motion. On June 1, the Plaintiffs filed a Reply in Support [DE 78] of their Motion, and the Defendants filed a Reply Memorandum in Support [DE 79] of their Motion. On June 18, the Defendants filed a Notice of Supplemental Authority [DE 80], and on June 23, the Plaintiffs filed a Response to Defendants' Notice of Supplemental Authority [DE 81].

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If appropriate, summary judgment should be entered against a party who fails to so respond. Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that a court should enter summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial"). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

When cross-motions for summary judgment are filed, the Court evaluates each motion on its merits. The filing of such cross-motions does not imply the absence of material fact issues. Additionally, the parties bear "different burdens of proof with respect to particular facts," and "different legal theories will have an effect on which facts are material." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local 150*, 335 F.3d 643, 647–48 (7th Cir. 2003). The Court construes "all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)). Thus, when considering the Plaintiffs' Motion for Summary Judgment, the Court must give the Defendants the benefit of all conflicts in the evidence and the benefit of all reasonable inferences that might be drawn from the evidence in their favor, and when considering the Defendants' Motion, the roles are reversed.

## FACTUAL AND LEGAL BACKGROUND REGARDING THE PARTIES AND THE CODE OF JUDICIAL CONDUCT

### A.     The Plaintiffs

#### 1.     *Indiana Right to Life, Inc.*

IRL is a non-profit corporation incorporated in the State of Indiana. It was formed to unite individuals concerned about the sanctity of human life, to provide education regarding abortion, infanticide, and euthanasia, to promote the right to life, and to advance legislative and constitutional changes that promote the right to life. It advances these purposes by, among other things, sending questionnaires to candidates for public office, including state judicial candidates, eliciting their views on a number of legal, political, and social issues of interest to the group. IRL then publishes the candidates' views.

In 2002 and 2004, and most recently on March 22, 2008, IRL sent questionnaires to judicial candidates. The 2008 questionnaire began with the following discussion:

> In *Republican Party of Minnesota v. White*, 122 S. Ct. 2528 (2002), the U.S. Supreme Court recently held unconstitutional a canon of judicial ethics that prohibited candidates for elective judicial office from announcing their views on disputed legal or political issues. The canon violated the First Amendment because it prohibited speech on the basis of content and burdened speech of political candidates[—]a category of speech at the core of First Amendment freedoms. Judicial candidates may clearly express their views on legal and political issues without fear of being sanctioned by judicial or legal ethics authorities for doing so.
>
> Indiana Right to Life, Inc., certainly recognizes that judicial candidates should maintain actual and apparent impartiality. Thus, Indiana Right to Life recognizes that judicial candidates should not pledge or promise certain results in particular cases. Nevertheless, in judicial elections, voters need to know the views of judicial candidates in order to make intelligent and conscientious decisions regarding candidates' general views on the law and personal values. This questionnaire is intended to elicit candidates' views on issues of vital interest to the constituents of Indiana Right to Life without subjecting candidates answering its questions to accusations of partiality or requiring candidates to recuse

themselves in the future.

(Verified Second Am. Compl., Ex. 5 at 1, DE 67-6 (bold omitted).) It posed the following nine

propositions to candidates, each prefaced with some brief background or overview of the legal or

political issue:

1. VALUE OF EARLY HUMAN LIFE. . . . I believe that the unborn child is biologically human and alive and that the right to life of human beings should be respected at every stage of their biological development.

2. LEGAL ABORTION. . . .
   a. I believe that abortion should be permitted only to prevent the death of the mother.
   b. I believe that abortion should be permitted only to prevent the mother's death, in cases of incest, and in reported cases of forcible rape.
   c. Other (please explain)

3. FEDERAL CONSTITUTIONAL RIGHT TO ABORTION. . . . I believe that *Roe v. Wade* was wrongly decided.

4. STATE CONSTITUTIONAL RIGHT TO ABORTION. . . . I believe that there is no provision in our current Indiana Constitution which is intended to protect a right to abortion.

5. STATE RIGHT TO ABORTION FUNDING. . . . I believe that *Humphreys v. Clinic for Women[, Inc.,* 796 N.E.2d 247 (Ind. 2003),] was wrongly decided.

6. STATE RIGHT TO ASSISTED SUICIDE. . . . I believe that there is no provision of the current Indiana Constitution which is intended to protect a right to assisted suicide.

7. DISPOSITION OF HUMAN BEINGS IN VITRO. . . . I believe that human beings whose lives begin by in vitro fertilization or cloning and who exist outside the body of a woman are not personal property and should be treated in accord with their best interests in any dispute over their disposition.

8. WRONGFUL LIFE. . . . I do not believe that a person should be able to sue another because he or she was born alive with a disability rather than aborted.

9.      WRONGFUL BIRTH. . . . I believe that *Bader v. Johnson*, 732 N.E.2d
1212 ([Ind.] 2000) was wrongly decided.

(Verified Second Am. Compl., Ex. 5 at 1–5, DE 67-6 (bold omitted).) Candidates are asked to

indicate one of the following responses to each of these propositions: "agree," "disagree,"

"undecided," "decline," or "refuse to answer." The "decline" response is accompanied by an

asterisk with the following statement:

> By declining to answer, I assert that I would have replied to this question but for
> the prospect that I may be disciplined for doing so under Indiana Judicial Canon
> 5A(3)(d)(i) and (ii)—which provides that a judicial candidate "shall not: (ii)
> make pledges or promises of conduct in office other than the faithful and impartial
> performance of the duties of the office; [or] (ii) make statements that commit or
> appear to commit the candidate with respect to cases, controversies or issues that
> are likely to come before the court." I also will not answer because doing so could
> subject me to mandatory recusal as a judge under Canon 3E(1), which requires "A
> judge [to] disqualify himself or herself in a proceeding in which the judge's
> impartiality might reasonably be questioned." My response would neither cause
> me to be biased for or against parties nor affect my ability to be open-minded with
> regard to any issue.

(Verified Second Am. Compl., Ex. 5 at 2–6, DE 67-6.) The abortion legality question provided

respondents several blank lines to explain what they might mean by "other."

IRL received thirty-five responses from judicial candidates. Five candidates responded

by letter, one of which stated that the candidate believed "responding to the survey would violate

the judicial canons that are currently in place" and therefore "decline[d] to respond to [the]

survey." (Verified Second Am. Compl., Ex. 6 at 2, DE 67-7.) Thirty-one of these respondents

filled out the questionnaire, and twenty-one of these declined to answer some or all of the

questions. From these respondents, there were indications that a threat of discipline based upon

the Code of Judicial Conduct or a prospect of violating a judicial conduct canon was a factor in

their decision to decline to answer the questionnaire. Ten responded to each of the nine

propositions, but IRL did not publish the responses out of a concern that these respondents would be subject to discipline under the Code or would be required to recuse themselves from cases involving issues discussed in the questionnaire.

IRL wanted to publish responses to its 2008 questionnaire of judicial candidates before the May 2008 primary election and the November 2008 general election. IRL desires to publish responses of judicial candidates to identical questionnaires in future elections.

## 2.     *Torrey Bauer*

Plaintiff Torrey Bauer is an attorney in Kosciusko County, Indiana. In the 2008 Republican primary race, he was a candidate for superior court judge in the Kosciusko County, but he was not nominated. Mr. Bauer completed and returned the 2008 IRL questionnaire, unaware of the Seventh Circuit's reversal of the injunction entered by Judge Allen Sharp. He did not contact the ICJQ for advice regarding whether answering the 2008 questionnaire would violate the Code. Mr. Bauer has expressed some concern that he may have violated the pre-2009 Code by completing the 2008 questionnaire and that he may therefore be subject to discipline. He has also indicated that he intends to run for judicial office in the future, that he would decline to answer future IRL questionnaires based upon the provisions of the 2009 Code, and that he may have to recuse himself from cases in the event he wins a bid for judge.

3.    ***Judge David Certo***

Judge David Certo is a superior court judge in Marion County, Indiana. In 2007, he was appointed by Governor Mitch Daniels to fill a vacancy on that court. When he accepted the appointment, he knew that the canons of judicial conduct would limit his partisan political activities. In 2008, he was a candidate for re-election to that office. When he received the 2008 IRL questionnaire, he considered providing substantive answers, but was unsure whether he was permitted to answer under the canons. He sought legal advice from Mr. James Bopp, his counsel in this case, but he did not inquire of the ICJQ whether answering the questionnaire would violated the Code. He did not answer any of the questions in the questionnaire because he thought he was prohibited from doing so by the "pledges or promises clause" and the "commits clause" of the pre-2009 Code and would be required to recuse himself from cases involving issues addressed in the questionnaire. Judge Certo has expressed that he intends to run for judicial office in the future and that he believes the 2009 Code would prohibit him answering future questionnaires.

Judge Certo, who has been active in Republican Party politics for many years, wants personally to solicit funds for his own campaign from non-attorneys and out-of-state attorneys and to solicit first-time donations from groups of young people and donors to the Republican Party to encourage financial participation in state and local Republican Party activities. He also wants to continue to participate in certain activities he has previously engaged in, such as serving as a delegate to the Indiana State Republican Convention, speaking at political club meetings on behalf of Republican judges and the Republican Party, and speaking to students on behalf of the Republican Party at events such as the Eastern Indiana Model Legislature.

**B.      Judicial Power and Judicial Selection in Indiana**

Through Article 7, § 1 of the Indiana Constitution, the people of Indiana have vested the judicial power of the state in the judicial branch. Ind. Const. art. 7, § 1 ("The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish."); *State v. Monfort*, 723 N.E.2d 407, 409 (Ind. 2000). Under the Constitution, the General Assembly has the power both to create and to abolish courts, although it "cannot entirely abolish the courts whose existence is constitutionally mandated" and must not transgress the separation of powers doctrine of Article 3, § 1 of the Indiana Constitution. *Monfort*, 723 N.E.2d at 410, 411–14. The General Assembly has enacted statutes establishing and organizing courts throughout the state, including specifying qualifications for judges, setting terms of office, and providing for the selection of judges, which may occur through elections or nominating processes. *See, e.g.,* Ind. Code §§ 33-26-1-1, 33-26-2-1 to -4, 33-28-2, 33-29-1-3, & 33-33. Most judicial elections in Indiana are partisan, but some are not. As to the selection of justices of the Indiana Supreme Court and judges of the Court of Appeals, Article 7, § 10 of the Indiana Constitution prescribes a process that involves the Indiana Judicial Nominating Commission submitting to the Governor a list of three nominees for each vacancy. Appointments to appellate courts in Indiana are to be made without regard to political affiliation. Article 7, § 11 defines the tenure of justices of the Indiana Supreme Court and judges of the Indiana Court of Appeals.

**C.      The Jurisdiction of the Indiana Supreme Court, the ICJQ, and the IDC**

The Supreme Court of Indiana has exclusive jurisdiction in matters involving the

admission of attorneys to the practice of law in Indiana, the discipline of attorneys admitted to the bar of the Indiana Supreme Court, and the discipline, removal, and retirement of all of Indiana's judicial officers. Ind. Const. art. 7, § 4 ("The Supreme Court shall have no original jurisdiction except in admission to the practice of law; discipline or disbarment of those admitted; the unauthorized practice of law; discipline, removal, and retirement of justices and judges; supervision of the exercise of jurisdiction by the other courts of the State; and issuance of writs necessary or appropriate in aid of its jurisdiction."); *In re Keller*, 792 N.E.2d 865, 867 (Ind. 2003) (per curiam) (stating that Article 7, § 4 of the Indiana Constitution "vests this Court with exclusive jurisdiction in matters involving the admission and discipline of attorneys"); Ind. Code § 33-24-1-2(b)(1) (recognizing the Indiana Supreme Court's exclusive jurisdiction to admit attorneys to practice law in all courts of the state under rules and regulations as the supreme court may prescribe); Ind. Code § 33-24-3-1 (providing for the Indiana Supreme Court to "adopt and publish rules in conformity with [§] 33-24-1-2(b) specifying the terms and conditions under which the supreme court . . . exercise[s] jurisdiction"); Ind. Admission & Discipline R. 23(1) (stating that "[t]he Supreme Court has exclusive jurisdiction of all cases in which an attorney who is admitted to the bar of this Court or who practices law in this State (hereinafter referred to as 'attorney') is charged with misconduct," and providing that, for purposes of this rule, the term "attorney" includes "any and all judges of any and all courts of this State," as well as all persons who are admitted to the bar of the Indiana Supreme Court or who practice law in Indiana); Ind. Admission & Discipline R. 25(I)(A) ("Pursuant to Article 7, Section 4 of the Constitution of Indiana, the Supreme Court of Indiana . . . has exclusive, original jurisdiction for the discipline, removal, and retirement of all judicial officers of this state."). The preamble to Rule 25 of the

Indiana Rules for Admission to the Bar and the Discipline of Attorneys declares that "[t]he regulation of judicial conduct is critical to the integrity of the judiciary and to public confidence in the judicial system" and that "[t]he purpose of this rule is to provide a mechanism for the discipline of judicial officers of the State of Indiana." Ind. Admission & Discipline R. 25.

The ICJQ, the members of which are sued in their official capacities in this case, is an arm of the Indiana Supreme Court. The ICJQ was established by Article 7, § 9 of the Indiana Constitution, and it is authorized to receive and investigate complaints against all judicial officers of the state and to forward to the Indiana Supreme Court any recommendation for the discipline, removal, or retirement of any judicial officer of the state. Ind. Const. art. 7, § 9; Ind. Admission & Discipline R. 25(I)(B). The ICJQ has jurisdiction over conduct committed by a judicial officer and over violations of Canon 5 of the Code (presumably now Canon 4 of the 2009 Code) committed by a candidate for judicial office,[4] and the ICJQ may refer to the IDC allegations of misconduct committed by a judicial officer while an attorney and not during his or her term in judicial office. Ind. Admission & Discipline R. 25(I)(D) & (E). The ICJQ's statutory authority is set forth in Indiana Code § 33-38-13-1 *et seq*.

Margaret Babcock served as a staff attorney to the ICJQ from 1987 to 1992, and she has served as counsel to the ICJQ since 1992. She is responsible for answering formal and informal inquiries from judges, judicial candidates, and the public regarding the Code of Judicial Conduct and for advising judicial candidates whether a proposed course of conduct would violate the judicial canons. She represents the ICJQ in enforcing the Code and helps judges and judicial candidates to act in manner consistent with the impartiality and independence of the judiciary.

---

[4] Rule 25 of the Indiana Rules for Admission to the Bar and the Discipline of Attorneys appears not to have been updated to reference the 2009 Code, and thus it continues to refer to Canon 5 of the pre-2009 Code.

The IDC, whose members are also sued here in their official capacities, is an agency of the Indiana Supreme Court, and its powers and duties are outlined in Indiana Admission and Discipline Rule 23. Ind. Admission & Discipline R. 23(6). Among other things, it has the power and duty to supervise the investigation of claims of attorney misconduct. Ind. Admission & Discipline R. 23(8). According to Indiana Admission and Discipline Rule 23, "[a]ny conduct that violates the Rules of Professional Conduct or the Code of Judicial Conduct . . . or any standards or rules of legal and judicial ethics or professional responsibility . . . shall constitute grounds for discipline." Ind. Admission & Discipline R. 23(2).

Ms. Babcock did not advise any judicial candidates that the canons of judicial conduct prohibited them from answering IRL's 2008 questionnaire or threatened any candidates with discipline if they did. No complaints are pending before the ICJQ related to IRL's 2002, 2004, or 2008 questionnaire (or related to any other questionnaires submitted to judicial candidates or to questionnaire answers). The ICJQ has never instituted disciplinary proceedings against judicial candidates who have answered IRL's questionnaires. Similarly, to Ms. Babcock's knowledge, the ICJQ has never investigated or prosecuted a judicial candidate or judge for answering an interest group questionnaire.

**D.** ***Republican Party of Minnesota v. White*, the ICJQ's Advice, and *Shepard I***

In *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the Supreme Court declared that the "announce clause" of the Minnesota Code of Judicial Conduct violated the First Amendment. The announce clause at issue in that case prohibited a candidate for a judicial office, including an incumbent judge, from announcing his or her views on disputed legal or

political issues. *Id.* at 768. The Court determined that the announce clause covered "much more than promising to decide an issue in a particular way. The prohibition extends to the candidate's mere statement of his current position, even if he does not bind himself to maintain that position after election." *Id.* at 770. The *White* Court expressed "no view" regarding the clauses related to pledges or promises, which were not challenged in that case.[5] *Id.*

In response to the Supreme Court's decision in *White*, Ms. Babcock drafted, and the ICJQ adopted, Preliminary Advisory Opinion #1-02.[6] Prior to the 2002 general election, she distributed this advisory opinion to all judicial candidates. The opinion indicated that Indiana removed the "announce clause" from the Code of Judicial Conduct in 1993,[7] but it acknowledged that the ICJQ had, in effect, counseled judicial candidates against announcing their views on disputed social and legal issues. The opinion explained that, "in light of the *White* opinion, the Commission is compelled to acknowledge that candidates are permitted under the first amendment to state their general views about disputed social and legal issues." (Defs.' Ex. H at 2, DE 74-9.) The ICJQ added:

> Candidates have a constitutional right to state their views on, for example, abortion or the death penalty, to characterize themselves as "conservative" or "tough on crime," or to express themselves on any number of other philosophies or perspectives. These examples are not exclusive, but are those about which candidates in Indiana most often inquire.

---

[5] The Seventh Circuit has indicated that the "pledges or promises clauses" are "more limited provisions" than the "announce clause." *Shepard*, 507 F.3d at 546.

[6] It does not appear that the Preliminary Advisory Opinion #1-02 has been updated or superseded since the 2009 Code was adopted. (Defs.' Ex. A at 1–2, DE 74-2 (referencing the ICJQ's advisory opinions webpage at http://www.in.gov/judiciary/jud-qual/opinion.html).)

[7] In 1993, the Seventh Circuit issued its decision in *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224 (7th Cir. 1993), finding that the "announce clause" in the Illinois judicial conduct code violated the First Amendment.

(*Id.*) The opinion explained that the ICJQ could not provide a list of approved and disapproved statements because "the propriety of more particularized statements is too dependent upon context and facts to allow the Commission's prejudgment in most instances" and that "many issues about campaign speech will require ad hoc analysis." (*Id.* at 2–3.) Accordingly, the ICJQ advised candidates to contact it for advice prior to making campaign statements.

The opinion warns candidates of the ease with which one can inadvertently violate the canons:

> As a judicial candidate makes more specific campaign statements relating to issues which may come before the court beyond, for example, the somewhat amorphous "tough on crime" statement, or broad statements relating to the candidate's position on disputed social and legal issues, the candidate incurs the risk of violating the "commitment" clause and/or the "promises" clause. And, even where those clauses are not violated, the candidate's statements may invite future recusal requests, or even mandate recusal on future cases; as such, they are subject to criticism both by the opponent and by the Commission as interfering with the proper performance of the judicial duties and with the proper administration of justice. . . . Clearly, a statement indicating that a candidate will rule in a particular way violates the "commitment" clause and the "promises" clause. A candidate's statement must not be mutually exclusive with a pledge to be faithful to the law and to judge without partiality. A statement which appears to constitute a mere expression of fact, such as a candidate's reference to a record of imposing harsh penalties in criminal cases, may be deemed an implied promise of future conduct and, certainly, subjects the candidate to criticism for calling into question his or her ability to rule in each case on the evidence and the law, and not for the purpose of fulfilling a personal predilection. Such a statement will be looked upon by the Commission with disfavor, as it likely represents a bias against criminal defendants who later may appear before the candidate.

(*Id.* at 3.) Although some philosophical expressions may fall between an impermissible pledge and a proper statement about the best way to approach a social problem, such as the statement that "all drunk drivers should spend some time in jail," (*id.* at 3), such statement could require recusal in the ICJQ's opinion. (*Id.* at 4.) Statements of "literal fact" may even violate the canons because they are misleading, such as when a challenger criticizes an incumbent judge by stating

that "hundreds of litigants are still waiting for their cases to be heard," but no regard is given to the status of the cases when the incumbent judge presides in a busy court. (*Id.*) Such statements are inappropriate because they mislead voters into believing the judge is neglecting duties. (*Id.*) Similarly, a candidate cannot promise to "return integrity" to the bench or to "change the court to a forum where litigants will be treated with dignity" unless the statement is based on "objective and demonstrable facts about the incumbent's qualifications or record." (*Id.* at 5.)

On August 2, 2005, the Eighth Circuit issued its opinion in *Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir. 2005) (en banc). The court determined that the Minnesota partisan activities clause, which prohibited judges and judicial candidates from identifying themselves as members of political organizations, attending political gatherings, or seeking, accepting, or using endorsements from political organizations, violated the First Amendment. *Id.* at 754–63. It also decided that the Minnesota solicitation clause, which prohibited judges and judicial candidates from personally soliciting or accepting campaign contributions or personally soliciting public support, and which provided for judicial campaign committees, violated the First Amendment. *Id.* at 763–66.

As noted above, the earlier incarnation of this lawsuit (*Shepard I*) was instituted on September 29, 2004, a few years after the Supreme Court's *White* decision and the issuance of Preliminary Advisory Opinion #1-02. On November 28, 2006, Judge Sharp granted the plaintiffs' request for injunctive relief, permanently enjoining enforcement of the "pledges or promises clause" and the "commits clause" (former Canon 5A(3)(d)(i) and (ii)), but he denied the plaintiffs' request for a permanent injunction with respect to the "recusal requirement" (former Canon 3E(1)). *Shepard*, 463 F. Supp. 2d 879. On October 26, 2007, the Seventh Circuit

reversed Judge Sharp's ruling because the plaintiffs lacked standing. *Shepard*, 507 F.3d 545. The

Seventh Circuit located *Shepard I* in the genre of post-*White* lawsuits that "various groups have

filed . . . throughout the country" challenging the pledges/commitments clauses. *Id.* at 546

(citing, as examples, *Pa. Family Inst., Inc. v. Black*, 489 F.3d 156 (3d Cir. 2007), and *Alaska*

*Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840 (9th Cir. 2007)).

Meanwhile, as these cases and similar cases were working their way through the federal

and state courts, the American Bar Association (ABA) revised its Model Code of Judicial

Conduct. (Defs.' Ex. I.) The ABA adopted this revised Model Code in February 2007.


**E.     The Relevant Provisions of the Pre-2009 Code and *Shepard II***

Prior to the adoption of the 2009 Code, the Code consisted of five canons and included

provisions challenged in the Plaintiffs' original complaint and first amended complaint. Former

Canon 3E(1), the "recusal requirement," provided that "[a] judge shall disqualify himself or

herself in a proceeding in which the judge's impartiality might reasonably be questioned." It was

included under former Canon 3, which stated that "[a] judge shall perform the duties of judicial

office impartially and diligently."

Former Canon 5A(3)(d)(i), the "pledges or promises clause," provided that candidates for

judicial office shall not "make pledges or promises of conduct in office other than the faithful

and impartial performance of the duties of the office." Former Canon 5A(3)(d)(ii), the "commits

clause," provided that candidates for judicial office shall not "make statements that commit or

appear to commit the candidate with respect to cases, controversies or issues that are likely to

come before the court." Former Canon 5A(1) prohibited a judge or a judicial candidate from (a)

"act[ing] as a leader or hold[ing] office in a political organization," (b) "publicly endors[ing] or publicly oppos[ing] another candidate for office," or (c) "mak[ing] speeches on behalf of a political organization." Canons 5A(1)(a), (b), and (c) have been termed "partisan activities clauses." Former Canon 5A(1)(e) prohibited a judge or a judicial candidate from "solicit[ing] funds for, pay[ing] an assessment, slating fee or other mandatory political payment to, or mak[ing] a contribution to, a political organization or candidate, or purchas[ing] tickets for political party dinners or other functions," and former Canon 5C(2) prohibited a judicial candidate from "personally solicit[ing] or accept[ing] campaign contributions or personally solicit[ing] publicly stated support." Former Canons 5A(1)(e) and 5C(2) have collectively been referred to as the "solicitation clauses." Former Canon 5C(1) permitted judges and judicial candidates who are subject to public election to attend gatherings of political organizations, purchase tickets for such gatherings for the judge and the judge's guest, identify themselves as members of political parties, voluntarily contribute to political organizations, speak at gatherings on their own behalf, appear in media advertisements supporting their candidacies, distribute promotional campaign literature supporting their candidacies, and publicly endorse and attend gatherings for other candidates in the same public election. These canons were included under former Canon 5, a general standard requiring that "[a] judge or judicial candidate shall refrain from inappropriate political activity."

On April 18, 2008, the Plaintiffs instituted this lawsuit (*Shepard II*). On May 6, the Court granted the Plaintiffs' request for a preliminary injunction enjoining enforcement of the "pledges or promises clause" and the "commits clause" (former Canon 5A(3)(d)(i) and (ii)) against judicial candidates who respond to the IRL's 2008 questionnaire. On June 5, the Plaintiffs filed

an amended pleading in which they challenge the "pledges or promises clause" (Canon 5A(3)(d)(i)), the "commits clause" (Canon 5A(3)(d)(ii)), and the "recusal requirement" (Canon 3E(1)), as well as the "partisan activities clauses" (Canon 5A(1)(a) & (c)), the "solicitation clauses" (Canon 5A(1)(e) & 5C(2)), and Canons 5A(1)(b), 5C(1)(g), and 5C(2).

**F.      The Relevant Provisions of the 2009 Code**

Meanwhile, the Indiana Supreme Court was in the process of revising the Indiana judicial conduct code. In September 2008, the Indiana Supreme Court announced its adoption of a substantially revised Code of Judicial Conduct that would be effective on January 1, 2009. On September 19, the Court issued its Order Amending Code of Judicial Conduct. This new Code is patterned after the 2007 Model Code of Judicial Conduct approved by the American Bar Association. (Agreed Prelim. Inj. Ex. 3.)

The 2009 Code consists of four canons and rules under each canon, as well as a preamble and sections addressing scope, terminology, and application. All provisions of the Code apply to full-time judges, but with part-time judges, not all provisions apply. Under the Code, a judge is any person authorized to perform judicial functions within the courts of the Indiana judiciary. Canon 4 applies to judicial candidates. The Code defines "judicial candidate" as follows:

> any person, including a sitting judge, who is seeking selection for or retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, authorizes or, where permitted, engages in solicitation or acceptance of contributions or support, or is nominated for election or appointment to office.

Indiana Rule of Professional Conduct 8.2(b) requires lawyers who are candidates for judicial office to "comply with the applicable provisions of the Code of Judicial Conduct."

The preamble to the Code highlights some of the principles and values that have guided the Indiana Supreme Court in adopting the standards contained in the Code. It states:

> An independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, the judiciary plays a central role in preserving the principles of justice and the rule of law. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.
>
> Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives. They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence.
>
> The Code of Judicial Conduct establishes standards for the ethical conduct of judges and judicial candidates. It is not intended as an exhaustive guide for the conduct of judges and judicial candidates, who are governed in their judicial and personal conduct by general ethical standards as well as by the Code. The Code is intended, however, to provide guidance and assist judges in maintaining the highest standards of judicial and personal conduct, and to provide a basis for regulating their conduct through disciplinary agencies.

Canon 1 mandates that judges "uphold and promote the independence, integrity, and impartiality of the judiciary, and . . . avoid impropriety and the appearance of impropriety." The Code defines "impartial," "impartiality," and "impartially" to "mean absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." "Independence" refers to "a judge's freedom from influence or controls other than those established by law," and "integrity" is defined as "probity, fairness, honesty, uprightness, and soundness of character." "Impropriety" refers to "conduct that violates the law, court rules, or provisions of this Code, and conduct that undermines a judge's independence, integrity, or impartiality."

Canon 2 requires that "[a] judge shall perform the duties of judicial office impartially,

competently, and diligently." Rule 2.10 of the Code addresses judicial statements on pending and impending cases. The Code defines "impending matter" as "a matter that is imminent or expected to occur in the near future," and "pending matter" as "a matter that has commenced." A pending matter "continues to be pending through any appellate process until final disposition." Rule 2.10(A) states that "[a] judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing." Rule 2.10(B) states that "[a] judge shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." Rule 2.11 addresses disqualification, and Rule 2.11(A)(5) mandates the following:

> (A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
> . . .
> (5) The judge, while a judge or a judicial candidate, has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

Canon 3 requires judges to conduct their "personal and extrajudicial activities to minimize the risk of conflict with the obligations of judicial office."

Canon 4 prohibits judges and candidates for judicial office from "engaging in political or campaign activity that is inconsistent with the independence, integrity, or impartiality of the judiciary." Rule 4.1 addresses political and campaign activities of judges and judicial candidates in general, and Rule 4.1(A) provides in relevant parts as follows:

25

Except as permitted by law,[8] or by Rules 4.1(B), 4.1(C), 4.2, 4.3, and 4.4, a judge or a judicial candidate shall not:

    (1) act as a leader in or hold an office in a political organization;[9]

    (2) make speeches on behalf of a political organization;

    (3) publicly endorse or oppose a candidate for public office;

    (4) solicit funds for, pay an assessment to, or make a contribution to a political organization or a candidate for public office;[10]

    . . .

    (8) personally solicit or accept campaign contributions other than through a campaign committee authorized by Rule 4.4; [or]

    . . .

    (13) in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office.

Rule 4.1(B) requires judges and judicial candidates to ensure that other persons do not undertake any prohibited activities on behalf of the judge or judicial candidate. Rule 4.1(C) permits "a judge in an office filled by partisan election, a judicial candidate seeking that office, and a judicial officer serving for a judge in office filled by partisan election" to do the following at any time:

    (1) identify himself or herself as a member of a political party;

    (2) voluntarily contribute to and attend meetings of political organizations; and

---

[8] The Code defines the term "law" to encompass court rules, statutes, constitutional provisions, and decisional law.

[9] The Code defines "political organization" as "a political party or other group sponsored by or affiliated with a political party or candidate, the principal purpose of which is to further the election or appointment of candidates for political office," but the term is understood to exclude a judicial candidate's campaign committee created as authorized by Rule 4.4.

[10] The Code defines "contribution" as "both financial and in-kind contributions, such as goods, professional or volunteer services, advertising, and other types of assistance, which, if obtained by the recipient otherwise, would require a financial expenditure."

(3) attend dinners and other events sponsored by political organizations and may purchase a ticket for such an event and a ticket for a guest.

Rule 4.2 addresses the political and campaign activities of judicial candidates in public elections, and Rule 4.3 addresses activities of candidates for appointive judicial office. Rule 4.4 provides for campaign committees to manage and conduct campaigns for candidates and sets forth certain restrictions.

The parties in this case have adopted a fairly similar set of labels and groupings of the canons and rules that the Court will modify so as not to confuse provisions of the new Code with provisions of the earlier Code. Rules 2.10(B) and 4.1(A)(13) will be referred to collectively as the Pledges, Promises, and Commitments Prohibition, and these current rules differ materially from the "pledges or promises clause" and the "commits clause" of the pre-2009 Code (former Canon 5A(3)(d)(i) & (ii)).

Rule 2.11(A)(5) will be referred to as the Prior-Commitment Recusal Requirement. Although former Canon 3E(1) appears in current Rule 2.11(A) with only a slight modification (the word "any" was substituted for the indefinite article "a" before the word "proceeding"), the 2009 Code adds in Rule 2.11(A)(5) the recusal-requiring circumstance of a judge (while a judge or a judicial candidate) making a public statement (other than in a court proceeding, judicial decision, or opinion) that "commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy." This addition of the Prior-Commitment Recusal Requirement to the 2009 Code is a material change to the "recusal requirement" of the pre-2009 Code.

Rules 4.1(A)(1) and (2) will be referred to as the Partisan Activities Restriction. Although the 2009 Code makes some minor wording changes, Rules 4.1(A)(1) and (2) are not

materially different from the "partisan activities clauses" of the pre-2009 Code (former Canon 5A(1)(a) & (c)).

Finally, Rules 4.11(A)(4) & (8) will be referred to as the Partisan Solicitation Restriction. Before the Code was amended, the Partisan Solicitation Restriction was found in former Canon 5. Although Rules 4.1(A)(4) and (8) of the 2009 Code make some minor wording changes, they are not materially different from the "solicitation clauses" in the pre-2009 Code (former Canons 5A(1)(e) & 5C(2)). Former Canon 5C(2) also provided for campaign committees to conduct campaigns for judicial candidates, which Rule 4.4 of the 2009 Code addresses.


## ANALYSIS

The Plaintiffs challenge the constitutionality of the following rules in the 2009 Code: the Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) and 4.1(A)(13)); the Prior-Commitment Recusal Requirement (Rule 2.11(A) & (A)(5)); the Partisan Activities Restriction (Rules 4.1(A)(1) & (2)); and the Partisan Solicitation Restriction Rules 4.11(A)(4) & (8). They also continue to challenge former Canon 5A(3)(d)(i) and (ii) of the pre-2009 Code, and the Court will begin by addressing the claims against former Canon 5A(3)(d)(i) and (ii).

**A.      The Plaintiffs' Claims as to the Pre-2009 Code**

The Plaintiffs claim that the "pledges or promises clause" and the "commits clause" of former Canon 5A(3)(d)(i) and (ii) are unconstitutional both facially and as applied to the questionnaire. Despite the fact that the Indiana Supreme Court has adopted a new Code that supersedes and replaces the old Code, the Plaintiffs argue that the issues related to these pre-2009 Code provisions are not moot. They urge that the collateral consequence of possible judicial discipline for speech engaged in under the protection of this Court's preliminary injunction persists and that the possibility of enforcement of these clauses "is a reasonable and real concern." (Pls.' Mem. in Supp. 12.) For these reasons, they request that the Court enter a permanent injunction barring enforcement of the clauses, "unless the [ICJQ] is willing to agree that it will not enforce the former commits clause against Plaintiffs Certo and Bauer or against others who similarly responded under protection of the preliminary injunction." (Pls.' Mem. in Supp. 12.)

The Defendants argue that the Plaintiffs' claims regarding former Canon 5A(3)(d)(i) and (ii) are moot. In addition to noting that the Plaintiffs have received the remedy they sought regarding these former Code provisions, which are no longer in effect, the Defendants state that the ICJQ will only enforce the canons in light of the Supreme Court's *White* decision and that the ICJQ "has never enforced" the former "pledges or promises" clause, the former "commits clause," or the current Pledges, Promises, and Commitments Prohibition "against anyone who has answered the questionnaire despite having multiple opportunities to do so." (Defs.' Mem. in Opposition 4; *see also* Defs.' Mem. in Supp. 12.) In making this argument, the Defendants reference Preliminary Advisory Opinion #1-02, which states that "candidates are permitted under

the first amendment to state their general views about disputed social and legal issues" and "have a constitutional right to state their views on, for example, abortion or the death penalty, to characterize themselves as 'conservative' or 'tough on crime,' or to express themselves on any number of other philosophies or perspectives." (Defs.' Ex. H at 2, DE 74-9.) Quoting the Seventh Circuit's opinion in *Shepard*, 507 F.3d at 550, they urge that there is "no evidence of a real threat of enforcement" against those who completed IRL's 2008 questionnaire. Additionally, the Defendants contend that this Court's preliminary injunction and its ruling that the former canons no longer have legal effect combine to make enforcement even less likely, that the ICJQ "is no longer defending any of its former Canons," and that their defense of the new Code is not "any sly intent to enable enforcement of the older Canons against the Plaintiffs." (Defs.' Reply Mem. 3–4.)

The Court has an ongoing obligation to determine whether it has jurisdiction to hear the Plaintiffs' claims, including those related to the pre-2009 Code. *See State of Ill. v. City of Chi.*, 137 F.3d 474, 479 (7th Cir. 1998) ("[A] court is not free to decide the merits when there is no justiciable controversy. Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further."). The Supreme Court has instructed that "Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'" *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, —, 127 S. Ct. 2553, 2562 (2007) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (internal quotation marks omitted)). In *Flast v. Cohen*, the Supreme Court explained some of the deeper meaning of the case-and-controversy doctrine:

Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Id.*, 392 U.S. 83, 94–95 (1968). Under established standing doctrine, "the party invoking the court's authority [must] demonstrate a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Laskowski v. Spellings*, 546 F.3d 822, 825 (7th Cir. 2008) (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)).

When subsequent developments in a case render an issue or question to be adjudicated in a case moot, a question arises as to whether a justiciable controversy remains present in the case. Indeed, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Evtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotations and citations omitted). As a consequence, "[w]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome, the case is (or the claims are) moot and must be dismissed for lack of jurisdiction." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 626 (7th Cir. 2006) (internal quotations and citations omitted).

The Court finds that the Plaintiffs' remaining claims related to the pre-2009 Code (the "pledges or promises clause" and the "commits clause" of former Canon 5A(3)(d)(i) and (ii) have become moot, based upon the Indiana Supreme Court's adoption of the 2009 Code. The

new Code includes a Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) and 4.1(A)(13)) that differs materially from and has narrower language than the former "pledges or promises clause" and the former "commits clause." Thus, even though the Plaintiffs were at one point entitled to pursue claims as to the pre-2009 Code, and even though the Plaintiffs did in fact receive from the Court some of the relief they sought as to the former "pledges or promises clause" and the former "commits clause," the dispute regarding these two provisions of the old Code no longer rages.

In finding these claims moot, the Court finds persuasive the Tenth Circuit's recent decision in *Kansas Judicial Review v. Stout*, 562 F.3d 1240 (10th Cir. 2009), which the parties in this case have cited in their submissions. The court in *Stout* confronted a very similar situation to the one the Court encounters here. While the *Stout* case was pending before the Tenth Circuit, the Kansas Supreme Court adopted a new judicial conduct code that significantly revised the "pledges or promises" and "commits" clauses and eliminated another clause. Although the district court had entered a preliminary injunction enjoining enforcement of these clauses under the old code and although the matter was pending before the Tenth Circuit, the *Stout* court determined that the plaintiffs' challenges to the superseded and replaced canons were moot. *Id.* at 1246. In so finding, the court noted the general rule that "repeal of a challenged statute causes a case to become moot because it extinguishes the plaintiff's legally cognizable interest in the outcome, rendering any remedial action by the court ineffectual." *Id.* at 1246. The Seventh Circuit has similarly stated that "any dispute over the constitutionality of a statute becomes moot if a new statute is enacted in its place during the pendency of the litigation, and the plaintiff seeks only prospective relief." *Zessar v. Keith*, 536 F.3d 788, 793 (7th Cir. 2008). In this case,

the Plaintiffs have sought declaratory and injunctive relief and no damages, and thus their claims related to the former canons are moot.

The Court also finds persuasive the Tenth Circuit's treatment of the collateral consequence doctrine in *Stout*. The Tenth Circuit explained that, under the doctrine, when a secondary or collateral injury remains despite the resolution of the plaintiff's primary claim, the case is not moot, but that the case is moot "if no consequences can be foreseen or if foreseeable possible consequences seem remote." *Stout*, 562 F.3d at 1248 (internal quotations and citations omitted). Like the *Stout* court, the Court finds that the Plaintiffs' allegations of possible collateral consequences are speculative and remote and that disciplinary action under the former "pledges or promises clause" and the former "commits clause" against judges and judicial candidates who completed the 2008 IRL questionnaire is not foreseeable.[11] The Court notes that counsel for the Defendants on October 7, 2008, repeatedly represented to the Court that, after January 1, 2009, the former Code will no longer be in effect. (Tr. 11–12.) Of course, the former Code referenced by counsel included the former "pledges or promises clause" and the former "commits clause," which were the subject of this Court's preliminary injunction. Additionally, the Court understands the sum total of the Defendants' representations to the Court (coupled with the Indiana Supreme Court's adoption of the 2009 Code with materially different provisions) to constitute an acknowledgment that the Defendants will not enforce the former

---

[11] The Court is mindful of the exception to mootness articulated by the Seventh Circuit in *Zessar*. The court there noted that amendment or repeal of a challenged statute does not deprive a court of its power to decide a claim or a case if it is not absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. *Id.*, 536 F.3d at 794. Because the lead Defendant in this action is a public official and because the rule-making body is the Indiana Supreme Court, which is comprised of public officials, the Court places "great[] stock in their acts of self-correction," and the Court has no reason to doubt their or their counsels' genuineness. *See id.* Thus, the Court has assurance that the challenged conduct under the old Code has ceased.

"pledges or promises clause" or the former "commits clause" against any respondent to the IRL 2008 questionnaire.

For these reasons, the Court will dismiss Counts I and II (the Plaintiffs' claims challenging the "pledges or promises clause" and the "commits clause" of former Canon 5A(3)(d)(i) and (ii)). The Court will also vacate the preliminary injunction entered on May 6, 2008, enjoining enforcement of the "pledges or promises clause" and the "commits clause" (Canon 5A(3)(d)(i) and (ii)) against judicial candidates who respond to the IRL's 2008 questionnaire.

**B.     The Plaintiffs' Claims as to the 2009 Code**

The Plaintiffs have asserted the following claims: the Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) & 4.1(A)(13)) is unconstitutional on its face and as applied to the questionnaire; the Prior-Commitment Recusal Requirement (Rules 2.11(A) & (A)(5)) is unconstitutional; the Partisan Activities Restriction (Rules 4.1(A)(1) & (2)) is unconstitutional on its face and as applied to Judge Certo; and the Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8)) is unconstitutional on its face and as applied to Judge Certo. The Defendants oppose these claims on an array of grounds, including justiciability, which the Court must address first.

1.     *The Justiciability Issues*

Before the Court can approach the merits of the Plaintiffs' claims challenging the 2009 Code provisions, the Court must revisit justiciability because the 2008 election season has

passed and because the new Code is now in effect. Justiciability requires, among other things, that the case or controversy be brought by parties with a sufficiently personal stake in the outcome (parties with "standing"), *see Allen*, 468 U.S. at 750, and not be contingent upon future events that may not occur as anticipated or at all (a case that is "ripe"), *see Texas v. United States*, 523 U.S. 296, 300 (1998).

The requirement that plaintiffs have standing to bring a case entails both constitutional and prudential limitations on the exercise of federal jurisdiction. As for the constitutional component, Article III requires that, at a minimum, plaintiffs make the following three showings:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations, quotations, ellipses, and brackets omitted). The requirement that the injury be particularized means that "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. The party invoking federal jurisdiction bears both the burden of production and persuasion as to all these elements. *See id.* at 561.

In addition to these constitutional requirements, plaintiffs must meet prudential standing requirements, "judicially self-imposed limits on the exercise of federal jurisdiction." *Allen*, 468 U.S. at 751. The prudential standing requirements have not been exhaustively defined, *see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), but they encompass "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of

generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751. As for the prohibition on raising another's rights, in the context of the First Amendment, there are "other concerns that justify a lessening of prudential limitations on standing." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Nat'l Park Hospitality Ass's v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). Ripeness is related to standing in that "if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996). "The difference between an abstract question calling for an advisory opinion and a ripe 'case or controversy' is one of degree, not discernible by any precise test." *Wis.'s Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410 (7th Cir. 1984) (citing *Babbitt*, 442 U.S. at 297).

"A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (internal citations omitted). To demonstrate ripeness in a pre-enforcement challenge, a plaintiff must show that the issues are fit for judicial decision and that the plaintiff will suffer a hardship if the court withholds consideration. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee*

*County*, 325 F.3d 879, 882 (2003). Hardship is established if (1) enforcement is certain, only delayed, or, (2) even if the enforcement is not certain, the mere threat of future enforcement has a present concrete effect and a later challenge will cause irremediably adverse consequences. *Id.*

a.     *IRL's, Judge Certo's, and Torrey Bauer's Standing as to and the Ripeness of Claims Challenging the Pledges, Promises, and Commitments Prohibition and the Prior-Commitment Recusal Requirement*

Because IRL is not subject to the 2009 Code, its First Amendment claims are based on a "right-to-listen" theory. In order for there to be First Amendment protection, there must be a willing speaker. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). "[W]here a speaker exists . . . the protection is afforded . . . to the communication, to its source and to its recipients both." *Id.* Based upon a review of the Plaintiffs' Verified Second Amendment Complaint and the parties' submissions, this theory is applicable only to IRL's claims against the Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) & 4.1(A)(13)) and the Prior-Commitment Recusal Requirement (Rules 2.11(A) & (A)(5)), and not the Partisan Activities Restriction (Rules 4.1(A)(1) & (2)) or the Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8)).[12]

In the previous suit (*Shepard I*) that IRL brought in this district, IRL advanced a right-to-listen theory, but IRL lacked sufficient evidence of a judicial candidate who wished to answer its

---

[12] The Verified Second Amended Complaint is not perfectly clear regarding which Plaintiffs are pursuing which claims. From the Court's review of the Verified Second Amended Complaint and the parties' submissions, it does not appear that Plaintiffs IRL and Bauer join Plaintiff Certo's claims related to the Partisan Activities Restriction (Rules 4.1(A)(1) & (2)) and the Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8)). In any event, even if the Plaintiffs' Verified Second Amended Complaint were construed so that Plaintiffs IRL and Bauer were understood to assert challenges to the Partisan Activities Restriction and the Partisan Solicitation Restriction, IRL would lack standing to bring such claims and would have to be dismissed, and Plaintiff Bauer has not made out a case for his standing on those claims.

questionnaire but did not do so because of the judicial conduct canons. The Seventh Circuit explained that, "[i]n a right-to-listen case, [IRL] would have standing if there are otherwise willing speakers who are constrained by the Judicial Code."[13] *Shepard*, 507 F.3d at 549.

In its May 6, 2008, Opinion and Order, the Court discussed at length the standing of the Plaintiffs, and the Court need not repeat that exhaustive analysis here. It is sufficient to note that IRL is joined by Plaintiffs Certo and Bauer, two willing speakers who would like to complete IRL's questionnaire without facing discipline under the provisions of the Code that regulate the speech of judicial candidates. Plaintiffs Certo and Bauer were judicial candidates when this lawsuit was instituted. Plaintiff Certo did not complete IRL's 2008 questionnaire because he believed he was prohibited from doing so by the pre-2009 Code. Plaintiff Bauer completed and returned IRL's 2008 questionnaire and has expressed concern about having possibly violated the pre-2009 Code by answering the questionnaire. Of course, the 2008 election cycle has now passed, and a new Code has been adopted. Nevertheless, Plaintiff Certo, presently a superior court judge, and Plaintiff Bauer, presently an attorney, have both attested to their intention to run for judicial office in future elections. Both have manifested a desire to discuss issues addressed in IRL's questionnaire. However, both have also attested to their concern that the 2009 Code prohibits them from answering IRL questionnaires in the future, subject them to discipline, and require recusal. There is no dispute that the 2009 Code is now in effect and would apply to Plaintiffs Certo and Bauer in the event they were to run for judicial offices in future elections,

---

[13] The Seventh Circuit also stated that, "[i]f there is no willing speaker, or if no speaker has been subjected to sanctions based on the Code, [IRL] does not have standing." *Shepard*, 507 F.3d at 549. Although this statement may create some ambiguity, it appears from the context that the Seventh Circuit was stating what it later restated in the following: "what [the *Buckley*] case had and the [*Shepard*] case lacks are plaintiffs who wanted to speak but felt constrained not to because of the Judicial Code or who were being disciplined for speaking out in violation of the Code." *Id.*

and that the First Amendment protects the political speech of judges and judicial candidates. Additionally, IRL has sent out questionnaires in 2002, 2004, and 2008, and it has indicated that it desires to send out and publish the results of such questionnaires in future elections. Furthermore, the Indiana Supreme Court (together with the ICJQ and the IDC) have the authority to investigate alleged violations of the 2009 Code and the Indiana Rules of Professional Conduct and to impose sanctions on judges, judicial candidates, and attorneys who violate the canons and rules.

The question of the Plaintiffs' standing as to the Pledges, Promises, and Commitments Prohibition and the Prior-Commitment Recusal Requirement is similar to the standing issue addressed by the Seventh Circuit in *Buckley*, 997 F.2d 224, although *Buckley* was not a right-to-listen case. The *Buckley* court noted that the two judicial candidates in that case were likely to run again for judicial office and that the challenged law "would affect future elections."[14] *Id.* at 226. The court observed that a "further consideration" in support of their standing was "the brevity of judicial campaigns in relation to the leisureliness of litigation, which prevented the appeals in th[o]se two cases from being decided before [the] retention campaign." *Id.*

For these reasons, the Court finds (as it did previously) that IRL has remedied the standing problem identified by the Seventh Circuit in *Shepard I* and that the Plaintiffs have demonstrated a concrete, particular, and actual injury traceable to the 2009 Code and the Defendants' conduct, and thus that they have standing to challenge the Pledges, Promises, and Commitments Prohibition and the Prior-Commitment Recusal Requirement in the 2009 Code.

---

[14] The Seventh Circuit also noted that the membership of the Illinois Judges Association, another plaintiff in that case, included many judges who would be running either for retention or higher judicial office, and that there was associational standing. *Id.* at 226–27.

The Court also finds that these claims are ripe for the Court's review.

b.  *Judge Certo's Standing as to and the Ripeness of Claims Challenging the Partisan Activities Restriction and the Partisan Solicitation Restriction*

Because Plaintiff Certo is presently a superior court judge, the 2009 Code governs his conduct. He has attested that he wants to solicit funds personally for his own campaign and to solicit first-time donations to the Republican Party to encourage financial participation in state and local Republican Party activities. He has also stated that he wants to participate in other partisan activities such as serving as a delegate to the Indiana State Republican Convention and speaking on behalf of the Republican Party and Republican judges. There is no dispute that the Code is in effect and would regulate this conduct in which Judge Certo would like to engage, and that the Indiana Supreme Court (together with the ICJQ) has the authority to investigate alleged violations of the 2009 Code and to impose sanctions on judges and judicial candidates who violate the canons and rules. For these reasons, the Court finds that Plaintiff Certo has demonstrated a concrete, particular, and actual injury traceable to the 2009 Code and the Defendants' conduct, and thus that he has standing to challenge the Partisan Activities Restriction and the Partisan Solicitation Restriction. The Court also finds that these claims are ripe for review.

2.  **The Constitutional Claims**

The central issue in this case, the application of First Amendment standards to the challenged rules governing judicial conduct, is well-suited for judicial decision. However, before analyzing the Plaintiffs' specific claims, the Court must identify the various interests at stake.

a.    *The Interests at Issue*

In this case, the free speech and association rights of judges and judicial candidates, which are protected by the First Amendment, bump into the interests of the people of Indiana in having a judiciary that is independent, fair, impartial, and competent, that is composed of individuals of integrity, and that preserves the principles of justice and the rule of law. *See Family Trust Found. of Ky., Inc. v. Wolnitzek*, 345 F. Supp. 2d 672, 694 (E.D. Ky. 2004) ("This case represents a perplexing intersection of an important state interest and a fundamental constitutional right: the interests of the state to ensure impartiality in the judiciary and the First Amendment rights of judicial candidates to express their opinions on legal issues, as well as the rights of voters to hear such information.").

(1)    The Interests Protected by the First Amendment

The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Freedom of association is inherently a part of those liberties protected by the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 15 (1976) ("The First Amendment protects political association as well as political expression."). The Supreme Court has declared:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed . . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts v. United States Jaycees,* 468 U.S. 609, 622 (1984) (citation omitted). The due process

clause of the Fourteenth Amendment makes the First Amendment applicable to the states, and thus the First Amendment prohibits state government from abridging these freedoms as well as Congress. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 336 n.1 (1995).

The Supreme Court has instructed that "'the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Buckley,* 424 U.S. at 15 (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971)). The constitutional form of government found in the United States was "borne of the great struggle to secure such freedoms as political speech," and "such freedom helps [to] [en]sure the continuance of that constitutional government." *White*, 416 F.3d at 748. Thus, "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley*, 424 U.S. at 14–15.

Political speech is speech at the core of the First Amendment, and it is highly protected. *White*, 416 F.3d at 749. Although political speech is not beyond all restraint, courts apply the strict scrutiny test to any regulation that would curtail it. *McIntyre,* 514 U.S. at 347. This test requires a showing that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest. *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 222 (1989); *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). Because the strict scrutiny test is an exacting inquiry, "it is the rare case in which . . . a law survives strict scrutiny." *Burson v. Freeman,* 504 U.S. 191, 211 (1992).

In general, the strict scrutiny test is something of "an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." *White*, 416 F.3d at 750. The test requires clarity regarding the state's interest. *White,* 536 U.S. at 775 ("Clarity on this point is essential before we can decide whether [the purported interest] is indeed a compelling state interest . . . ."). The Eighth Circuit has explained how such an end-and-means test works:

> The inquiry into whether the interest (the end) is "important enough"—that is, sufficiently compelling to abridge core constitutional rights—is informed by an examination of the regulation (the means) purportedly addressing that end. A clear indicator of the degree to which an interest is "compelling" is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being "compelling." If an interest is *compelling* enough to justify abridging core constitutional rights, a state will enact regulations that substantially protect that interest from similarly significant threats. As expressed in *White*: "'[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.'"

*White*, 416 F.3d at 750 (quoting *White*, 536 U.S. at 780 (quoting *The Florida Star v. B.J.F.,* 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring))). When a state interest is sufficiently compelling, the regulation addressing that interest must be narrowly tailored to serve that interest. *Eu,* 489 U.S. at 222. The Eight Circuit has explained the application of the narrowly tailored standard in the following:

> As with the compelling interest determination, whether a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest. A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*White*, 416 F.3d at 751 (citing cases).

Although the parties disagree regarding the constitutionality of the challenged rules governing judicial conduct, they seem to agree that the strict scrutiny standard applies because the regulations at issue restrict political speech.

(2)     The Interests Served by the 2009 Code

As noted above, the people of Indiana, through the Indiana Constitution and through their representatives, have expressed their will that the judicial power of Indiana be vested in the Indiana judiciary and that Indiana's judges be selected through several different processes, including appointment from among nominees recommended by a commission, retention elections, and partisan and nonpartisan elections. The people have also assigned to the Indiana Supreme Court the authority to regulate the conduct of attorneys, judges, and judicial candidates, and the Indiana Supreme Court has exercised that authority by, among other things, adopting the Indiana Rules of Professional Conduct and the Indiana Code of Judicial Conduct.

The 2009 Code makes clear the interests it is designed to serve. The preamble to the Code begins by emphasizing that "[a]n independent, fair and impartial judiciary is indispensable to our system of justice." It continues: "The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society." In addition to highlighting the central role that the judiciary plays "in preserving the principles of justice and the rule of law," it explains that the rules in the Code have inherent within them the "precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and

44

strive to maintain and enhance confidence in the legal system." Because the Code emphasizes a blend of interests that includes the fairness, impartiality, independence, integrity, and competence of the judiciary, as well as the principles of justice, and the rule of law, it seems a mistake to isolate particular interests in evaluating the constitutionality of particular rules.

The Indiana Supreme Court has linked the regulation of judicial conduct to the rights that are safeguarded in Article I, § 12 of the Indiana Constitution. This provision declares: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." The court has explained that this state constitutional provision requires it to "'construe and apply its rules governing the conduct of courts in such a manner as to be consistent with this provision so as to maintain the courts open for the administration of justice.'" *Tri Lakes Reg'l Sewer Dist. v. Geiger*, 830 N.E.2d 890, 891 (Ind. 2005) (per curium) (applying former Canon 3E and quoting *In re Appointment of a Special Judge in Wabash Circuit Court*, 500 N.E.2d 751, 752–53 (Ind. 1986)). Although the *Geiger* and *In re Appointment* cases posed specific questions related to the Code's disqualification or recusal requirement, the court's reasoning and reliance on Article I, § 12 suggests a broader application to the various canons and rules of the Code.

Of course, the interests served by the Code and this provision of the Indiana Constitution are not of recent vintage. The Indiana Supreme Court has linked values reflected in Article I, § 12 to the Magna Carta and the sorts of mischief that occurred in English courts, such as fines imposed or money paid to expedite or delay court proceedings, to procure favor, or to obtain justice and one's rightful due so that the king "'seemed to sell justice and right to some and to

delay or deny it to others.'" *State ex rel. Bd. of County Comm'rs v. Laramore*, 94 N.E. 761, 763 (Ind. 1911) (quoting *Perce v. Hallett*, 13 R.I. 363, 1881 WL 4157, at *1 (R.I. 1881)); *see also id.* ("This provision of our Constitution, while getting its substance, as similar provisions in other states Constitutions do, from Magna Charta, it may be, is a broader guaranty of free, unpurchased, and impartial justice than that the similar provision in that great instrument sought to establish."). *See also Smith v. Ind. Dep't of Corr.*, 883 N.E.2d 802, 806–08 (Ind. 2008) (tracing the history of this provision back through the 1816 Indiana Constitution and Sir Edward Coke's *Second Institute* to the Magna Carta). In a recent opinion interpreting Article I, § 12 , the court stated:

> We think this [review of the history of this provision] demonstrates an embracing of the notion, well accepted by 1851 [when the current Indiana Constitution was ratified], of an independent judiciary, and guarantees access to the courts to redress injuries to the extent the substantive law recognizes an actionable wrong. As such, the first sentence [of § 12] imposes some limitations on the actions of the legislative and executive branches. The second sentence addresses the values of speed and impartiality and is . . . "aimed at the judiciary, not the legislature."

*Id.* at 807 (quoting *Meech v. Hillhaven West, Inc.*, 776 P.2d 488, 493 (Mont. 1989)).

The Supreme Court of the United States, in its recent decision in *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252 (2009), determined that the federal due process rights of parties in a state case were violated when a state appellate judge failed to recuse himself from participating in the case, even though the judge in his election campaign for that judicial office received substantial financial support from a corporation that would later prevail in an appeal in which the judge participated. After noting that "a basic requirement of due process" is a "fair trial in a fair tribunal," the Court observed that "most matters involving judicial disqualification [do] not rise to a constitutional level," but would generally be matters of legislative discretion

regulated by statutes and judicial codes. *Id.* at 2259 (quotations and citations omitted). In

discussing *Tumey v. Ohio*, 273 U.S. 510 (1927), in which the Court had addressed the

disqualification of a mayor-judge based upon his financial interest in the outcome of a case, the

Court highlighted its concern "with a more general concept of interests that tempt adjudicators to

disregard neutrality" and reiterated the "controlling principle" of its decision in *Tumey*:

> "Every procedure which would offer a possible temptation to the average man as
> a judge to forget the burden of proof required to convict the defendant, or which
> might lead him not to hold the balance nice, clear and true between the State and
> the accused, denies the latter due process of law."

*Caperton*, 129 S. Ct. at 2260 (quoting *Tumey*, 273 U.S. at 532). After observing that it is not

possible to define "with precision" the degree or kind of interest that would warrant

disqualification under this possible "temptation" standard, the Court explained that the test is to

"have an objective component." *Id.* at 2261. In discussing *In re Murchison*, 349 U.S. 133 (1955),

in which the Court had addressed the disqualification of a judge who had convicted two

defendants for perjury and criminal contempt based upon their conduct in earlier proceedings

before that judge, the Court repeated its observation in *Murchison* that "the disqualifying criteria

'cannot be defined with precision. Circumstances and relationships must be considered.'"

*Caperton*, 129 S. Ct. at 2261 (quoting *Murchison*, 349 U.S. at 136). According to the Court, the

objective inquiry required is "whether the average judge in his position is 'likely' to be neutral,

or whether there is an unconstitutional 'potential for bias.'" *Id.* at 2262. Additionally, after

recognizing that "fairness and disinterest and neutrality are among the factors at work" in a judge

reaching a particular judgment in a case, the Court emphasized the challenge of inquiring into a

judge's potential bias:

> The difficulties of inquiring into actual bias, and the fact that the inquiry is

often a private one, simply underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review, though actual bias, if disclosed, no doubt would be grounds for appropriate relief. In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias.

*Id.* at 2263 (citing cases).

Although the parties disagree about what bearing the Supreme Court's decision in *Caperton* should have on this Court's ruling in this case—the Supreme Court did after all repeatedly note the exceptional, extraordinary, and extreme facts of that case)—*Caperton* does illustrate that judicial elections and judicial conduct (including the issue of recusal) can have important due process of law implications. Additionally, the *Caperton* Court noted that the state codes of judicial conduct "serve to maintain the integrity of the judiciary and the rule of law," and it quoted approvingly the following statement from the *amicus curiae* brief filed by the Conference of Chief Justices: "the codes are '[t]he principal safeguard against judicial campaign abuses' that threaten to imperil 'public confidence in the fairness and integrity of the nation's elected judges.'" *Caperton*, 129 S. Ct. at 2266 (quoting *amicus curiae* brief). For the Court, a state's interest in judicial integrity is "vital" and "of the highest order":

"Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order."

*Id.* at 2266–67 (quoting *White*, 536 U.S. at 793 (Kennedy, J., concurring). The Court concluded by observing that states may impose standards for judicial disqualification that are more rigorous

than are required by federal due process protections, that state "codes of judicial conduct provide more protection [of judicial integrity] than due process requires," and that most disputes over disqualification will be resolved under state judicial conduct codes. *Id.* at 2267. It should also be noted that, although Chief Justice Roberts, who was joined by three other justices, wrote a strong dissenting opinion, he did state that he shared "the majority's sincere concerns about the need to maintain a fair, independent, and impartial judiciary—and one that appears to be such." *Id.*

"Due process"-type concerns are also at play in Article I, § 12 of the Indiana Constitution. The Indiana Supreme Court has declared that Article I, § 12 "has multiple strains, but they are not the same as the federal pair [involving due process]." *McIntosh v. Melroe Co.*, 729 N.E.2d 972, 975 (Ind. 2000). Nevertheless, the Indiana clause requiring a "remedy by due course of law" for injuries to "person, property, or reputation" "prescribes procedural fairness" in the civil context. *Id.* Thus, the court has instructed that, in the context of "a procedural right to 'remedy by due course of law' in a civil proceeding," "the Indiana Constitution has developed a body of law essentially identical to federal due process," but that, in the context of "state criminal procedural doctrines," protections have "almost uniformly developed, not by reference to Article I, Section 12, but rather under the various other more specific provisions that make up our state Constitution's counterpart to the Bill of Rights." *Id.* at 976. *Accord Sanchez v. State*, 749 N.E.2d 509, 514 (Ind. 2001) (discussing the applicability of Article I, § 12 in the civil and criminal contexts); *see also Doe v. O'Connor*, 790 N.E.2d 985, 988 (Ind. 2003) ("[W]e will employ the same methodology when analyzing a claimed denial of procedural due process violation of the Due Course of Law Clause of Art. I, § 12, as the Supreme Court [h]as used to analyze claimed violations of the Due Process Clause.") (citing cases); *Sanchez*, 749 N.E.2d at

515 ("[F]undamental fairness in judicial proceedings is assumed and required by our constitution. The common law has long been a basic building block in Indiana law. . . . [T]he references [in Indiana cases to a federal and state constitutional requirement of due process] reflect the common understanding that courts of this state are constitutionally bound by the basic concepts of fairness that are frequently identified with 'due process' in the federal constitution.").

This review of the interests at stake shows that the interests put forward by both sides are of the highest importance in our system of government. Judges and judicial candidates have a compelling interest in free speech and association, and the people of Indiana and the Indiana Supreme Court have compelling interests in the principles of justice, the rule of law, and a judiciary characterized by fairness, impartiality, independence, integrity, and competence. As a consequence, the Indiana Supreme Court must carefully balance the various values and interests at stake and narrowly tailor the rules governing the conduct of judges and judicial candidates to serve these interests. *Cf. White*, 536 U.S. at 821 (Ginsburg, J., dissenting) ("For more than three-quarters of a century, States like Minnesota have endeavored, through experiment tested by experience, to balance the constitutional interests in judicial integrity and free expression within the unique setting of an elected judiciary."); *Buckley*, 997 F.2d at 231 ("[T]he principle of impartial justice under law is strong enough to entitle government to restrict the freedom of speech of participants in the judicial process, including candidates for judicial office, but not so strong as to place that process completely outside the scope of the constitutional guaranty of freedom of speech."). The question that the Court must now decide is whether the current regulations permissibly restrict political speech under the strict scrutiny standard.

b.      *The Rules at Issue*

The Indiana Supreme Court, in response to decisions by the United States Supreme Court and other federal courts determining the constitutionality of provisions governing judicial conduct, has repeatedly adjusted the applicable rules and the advice given to lawyers, judges, and judicial candidates regarding permissible conduct. As it has responded to these decisions and made necessary adjustments, the Indiana Supreme Court has balanced the various values and interests at stake.

(1)      The Pledges, Promises, and Commitments Prohibition

Compared to the "pledges or promises clause" and the "commits clause" of the pre-2009 Code (former Canon 5A(3)(d)(i) & (ii)), the Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) and 4.1(A)(13) of the 2009 Code) is a substantially narrower restriction of political speech by judges and judicial candidates. According to the terms of Rule 2.10(B), judges are prohibited from making "pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office," but this is further qualified by the narrowing statement "in connection with cases, controversies, or issues that are likely to come before the court." Rule 4.1(A)(13) makes Rule 2.10(B) applicable to both judges and judicial candidates in the context of political and campaign activities. *See* Rule 4.1, cmt. 14. By contrast, the more restrictive "pledges or promises clause" (former Canon 5A(3)(d)(i)) prohibited candidates for judicial office from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office," and the more restrictive "commits clause" (former Canon 5A(3)(d)(ii)) prohibited candidates for judicial office

from making "statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court." Thus, unlike the old standards, Rule 2.10(B) does not restrict the pledges or promises that judges and judicial candidates may make to the faithful and impartial performance of the duties of the office, and it does not include the "appear to commit" language that was problematic in the "commits clause."

Comment 1 to Rule 2.10 indicates that the rule's "restrictions on judicial speech are essential to the maintenance of the independence, integrity, and impartiality of the judiciary." Rule 2.10, cmt. 1. On its face, this rule links its restrictions of judicial speech to the compelling interests of judicial independence (a judge's freedom from influence or controls other than those established by law), judicial integrity (a judge's probity, fairness, honesty, uprightness, and character), and judicial impartiality (the absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as the maintenance of an open mind in considering issues that may come before the judge). As noted earlier, Indiana's interests in judicial independence, integrity, and impartiality were not spawned overnight, but instead have a long history that extends back several centuries.

Comment 13 to Rule 4.1 observes that "[t]he role of a judge is different from that of a legislator or executive branch official, even when the judge is subject to public election." Rule 4.1, cmt. 13. As a consequence, "[c]ampaigns for judicial office must be conducted differently from campaigns for other offices." Rule 4.1, cmt. 13. This comment also expresses the Indiana Supreme Court's view that "[t]he narrowly drafted restrictions upon political and campaign activities of judicial candidates provided in Canon 4 allow candidates to conduct campaigns that provide voters with sufficient information to permit them to distinguish between candidates and

make informed electoral choices." Rule 4.1, cmt. 13.

The scope of prohibited conduct and speech under Rule 2.10(B) (together with Rule 4.1(A)(13)) is limited to pledges, promises, and commitments that compromise or undercut a judge's impartiality as to cases, controversies, and issues that are likely to come before the judge. Thus, judges and judicial candidates are permitted to make pledges, promises, and commitments that are consistent with judicial impartiality. Comment 15 to Rule 4.1 indicates that the propriety of pledges, promises, and commitments "is not dependent upon, or limited to, the use of any specific words or phrases," but that an objective, "totality of the statement" test will be applied to pledges, promises, and commitments "to determine if a reasonable person would believe that the candidate for judicial office has specifically undertaken to reach a particular result." Rule 4.1, cmt. 15. Such an objective standard is consistent with the objective test put forward by the Supreme Court in *Caperton*.

The comments to Rule 4.1 provide additional guidance to judges and judicial candidates regarding what is permitted and what is prohibited. The comments expressly indicate that certain statements or announcements are permitted, as well as certain pledges, promises, or commitments. Judges and judicial candidates may make "statements or announcements of personal views on legal, political, or other issues, which are not prohibited." Rule 4.1, cmt. 15. However, they are encouraged, when they "mak[e] such statements" (in contrast to pledges, promises, or commitments), to "acknowledge the overarching judicial obligation to apply and uphold the law, without regard to [their] personal views." Rule 4.1, cmt. 15. Judges and judicial candidates may also "make campaign promises related to judicial organization, administration, and court management, such as a promise to dispose of a backlog of cases, start court sessions on

time, or avoid favoritism in appointments and hiring." Rule 4.1, cmt. 16. Similarly, they may

"pledge to take action outside the courtroom, such as working toward an improved jury selection

system, or advocating for more funds to improve the physical plant and amenities of the

courthouse." Rule 4.1, cmt. 16. As for questionnaires, Comment 17 provides the following:

> Judicial candidates may receive questionnaires or requests for interviews from the media and from issue advocacy or other community organizations that seek to learn their views on disputed or controversial legal or political issues. Paragraph (A)(13) does not specifically address judicial responses to such inquiries. Depending upon the wording and format of such questionnaires, candidates' responses might be viewed as pledges, promises, or commitments to perform the adjudicative duties of office other than in an impartial way. To avoid violating paragraph (A)(13), therefore, candidates who respond to media and other inquiries should also give assurances that they will keep an open mind and will carry out their adjudicative duties faithfully and impartially if elected. Candidates who do not respond may state their reasons for not responding, such as the danger that answering might be perceived by a reasonable person as undermining a successful candidate's independence or impartiality, or that it might lead to frequent disqualification. See Rule 2.11.

Rule 4.1, cmt. 17.

It is apparent from Rules 2.10(B) and 4.1(A)(13) that the Indiana Supreme Court expects

judges and judicial candidates to exercise good judgment and to act judiciously when they make

statements in office or in a campaign for office. This is not unreasonable, especially considering

the training and experience judges and judicial candidates have in the law and the office sought.

Additionally, it is reasonable to understand the role of a judge and the judicial office to be

different from the roles of politicians and other elective offices and to treat judicial campaigns

differently from campaigns for other offices, as Comment 13 to Rule 4.1 indicates. *See White*,

536 U.S. at 783 (responding to Justices Ginsburg and Stevens that the majority "neither assert

nor imply that the First Amendment requires campaigns for judicial office to sound the same as

those for legislative office"). Under the 2009 Code, judges and judicial candidates may engage in

a wide range of speech and may answer surveys and questionnaires. They may express their views on legal, political, and other issues, as the Supreme Court's opinion in *White* and Preliminary Advisory Opinion #1-02 permit. However, when they choose to speak, they must be thoughtful, judicious, and circumspect to ensure that through their conduct and speech they do not make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office (such as by committing to resolve matters in pending or impending matters in certain ways) or that undercut the judge's impartiality as to cases, controversies, and issues that are likely to come before the judge.

Considering the broad speech permitted under Rules 2.10(B) and 4.1(A)(13), the narrow scope of conduct and speech prohibited under these rules, and the careful definition of permissible and prohibited conduct and speech in the rules and comments, the Court finds that the Indiana Supreme Court has narrowly tailored Rules 2.10(B) and 4.1(A)(13) so that only speech that is inconsistent with impartiality is prohibited in the 2009 Code and that the Indiana Supreme Court has addressed the overboard and vagueness concerns related to the former "pledges or promises clause" and the former "commits clause."

As to the IRL questionnaire, the Court finds that the Pledges, Promises, and Commitments Prohibition of the 2009 Code does not prohibit judges and judicial candidates from answering IRL's 2008 nine-proposition questionnaire.[15] Preliminary Advisory Opinion #1-02 indicates that, under the First Amendment, judges and judicial candidates are permitted to state their general views about disputed social and legal issues, including by way of example

---

[15] It should go without saying that the Court in this case  (like Judge Sharp in *Shepard I*) "comes to its decision without regard to the political or social agendas of the Plaintiffs in this matter," and thus "nothing in this Court's order should be read to compel, or even encourage, judges or judicial candidates to answer questions put to them by these plaintiffs or any other group." *Shepard*, 463 F. Supp. 2d at 890.

their views on abortion and the death penalty. It also recognizes their right to characterize themselves as conservative or tough on crime and to express themselves on a range of other philosophies and perspectives. Similarly, Comment 15 to Rule 4.1 indicates that judges and judicial candidates may make "statements or announcements of personal views on legal, political, or other issues, which are not prohibited." Rule 4.1, cmt. 15. Additionally, the ICJQ has not enforced the former "pledges or promises clause" or the "commits clause" against any respondent to IRL's questionnaires, and it has committed itself to enforcing the Pledges, Promises, and Commitments Prohibition "only in light of *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002)." (Defs.' Mem. in Supp. 12 (citing Defs.' Exs. A & H.) However, this conclusion applies to the nine propositions in the 2008 questionnaire, and the assessment could change depending on how questions are worded and framed, what answers questions are intend to elicit, and what responses judicial candidates make, as Comment 17 to Rule 4.1 indicates. The questionnaire could improved with clear assurances that judicial candidate respondents will keep an open mind and carry out their adjudicative duties faithfully and impartially if elected.

Because the scope of prohibited conduct and speech under Rule 2.10(B) is limited to pledges, promises, and commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office in connection with cases, controversies, or issues that are likely to come before the court and because Rules 2.10(B) and 4.1(A)(13) otherwise permit broad political speech, the Court finds that the Pledges, Promises, and Commitments Prohibition of the 2009 Code is narrowly tailored to serve the compelling interests of judicial fairness, impartiality, independence, and integrity, as well as the principles of justice and the rule of law.

Accordingly, the Plaintiffs' claim that the Pledges, Promises, and Commitments Prohibition (Rules 2.10(B) & 4.1(A)(13)) is unconstitutional on its face and as applied to the questionnaire fails, and on Counts III and IV, judgment will be entered in favor of the Defendants and against the Plaintiffs.

(2)     The Prior-Commitment Recusal Requirement

The Prior-Commitment Recusal Requirement (Rule 2.11(A)(5) of the 2009 Code) is a specific provision that follows the more general disqualification requirement in current Rule 2.11(A). The general disqualification requirement, which requires judges to disqualify themselves in any proceeding in which their impartiality might reasonably be questioned, is essentially the same requirement as was found in former Canon 3E(1). Rule 2.11(A)(5) was added to the 2009 Code to mandate recusal in the specific circumstance where a judge (while he or she was a judge or a judicial candidate) has made a public statement (other than in a court proceeding, judicial decision, or opinion) that "commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy."

According to Comment 1 to Rule 2.11, the general disqualification requirement applies "whenever the judge's impartiality might reasonably be questioned," Rule 2.11, cmt. 1, and thus this general disqualification requirement employs an objective test, as *Caperton* and other Supreme Court precedent instruct. Additionally, this general recusal requirement applies whether any of the specific circumstances identified in Rule 2.11 apply. The specific circumstances added to Rule 2.11 bring additional clarity, definiteness, and concreteness to the general recusal requirement. They also specify a range of particular circumstances that require recusal because

they undercut judicial impartiality and integrity. For instance, Rules 2.11(A)(1), (3), and (6) address circumstances when a judge has a personal bias or prejudice concerning a party or has personal knowledge of facts that are in dispute in a case, when a judge knows that he or she (or a close relative) has an economic interest in the subject matter in controversy or in a party to the proceeding that could be substantially affected by the proceeding. As for the specific circumstance in Rule 2.11(A)(5) that requires disqualification, it includes public statements by judges or judicial candidates that commit or appear to commit the judges to reach particular results or to rule in particular ways in certain proceedings or controversies. Comment 7 to Rule 2.11 indicates that a statement that "appears to commit" under Rule 2.11(A)(5) is a statement "that a reasonable person would believe from the judge's public statement that the judge has specifically undertaken to reach a particular result," and thus the Prior-Commitment Recusal Requirement also employs an objective test.

The Plaintiffs are running up hill in challenging the general disqualification requirement and the Prior-Commitment Recusal Requirement, especially considering the Supreme Court's ruling in *Caperton* and the consistent decisions of courts upholding recusal requirements against constitutional challenges. *See, e.g., Shepard*, 463 F. Supp. 2d at 886–87 (citing cases), *rev'd on other grounds*, 507 F.3d 545. As explained earlier, the Supreme Court, in discussing the need for objective rules and standards, highlighted the challenge of defining with precision the disqualifying criteria, and the difficulty the law faces in superintending and reviewing a judge's own inquiry into actual bias. The *Caperton* Court noted approvingly "the judicial reforms the States have implemented to eliminate even the appearance of partiality." *Caperton*, 129 S. Ct. at 2266. In this context, the Court lauded the canon of judicial conduct that requires a judge to

avoid impropriety and the appearance of impropriety and that makes the test for appearance of impropriety "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."[16] *Id.* (quotations and citations omitted). The *Caperton* Court also spoke approvingly of the canon of judicial conduct requiring a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned" and observed the similarity between that canon and 28 U.S.C. § 455(a), which requires that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[17] *Id.* (quotations and citations omitted). The Supreme Court highlighted the objective standard that applies to the disqualification question.[18] *Id.* (quotations and citations omitted). The *Caperton* Court itself employed an objective test in evaluating the recusal issue in that case, and it observed that objective standards may require a judge to recuse "whether or not actual bias exists or can be proved" and that due process "'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" *Id.* at 2265 (quoting *Murchison*, 349 U.S. at 136). As noted earlier, the *Caperton* Court acknowledged the important function of

---

[16] The canon referenced by the Supreme Court is part of Canon 1 in the 2009 Code and former Canon 2 in the pre-2009 Code. The test for appearance of impropriety is included in Comment 5 to Rule 1.2 of the 2009 Code, and it is "whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge."

[17] The canon referenced by the Supreme Court is found in Rule 2.11(A) of the 2009 Code and former Canon 3E(1) of the pre-2009 Code.

[18] This same objective test is set forth in Comment 1 to Rule 2.11, which states that, "[u]nder this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply."

state codes of judicial conduct in maintaining the integrity of the judiciary and the rule of law and in safeguarding against judicial campaign abuses that imperil public confidence in the fairness and integrity of judges, and it approved of state judicial conduct codes imposing more rigorous standards to protect judicial integrity than the federal due process clause requires. Both the majority and the dissent in *Caperton* agreed that there is an important need to maintain a fair, independent, and impartial judiciary as well as the appearance of such a judiciary.

The Court finds that the Prior-Commitment Recusal Requirement (Rule 2.11(A)(5) of the 2009 Code), as well as the general disqualification requirement (Rule 2.11(A) of the 2009 Code), is narrowly tailored to serve judicial fairness, impartiality, independence, and integrity, as well as the principles of justice and the rule of law. Additionally, these rules are neither overbroad nor vague. These rules do not apply in every situation in which a judge makes a statement or expresses his or her views. Rather, they apply under the general disqualification requirement when a judge's impartiality is reasonably questioned (under an objective standard), and under the more specific circumstance when a judge's public statement commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy (under an objective standard). Additionally, a judge is capable of determining those circumstances when a statement might commit or appear to commit him or her to reach a particular result or rule in a particular way and thus require recusal. As the Court found above, judges and judicial candidates do not violate the Pledges, Promises, or Commitments Prohibition by answering IRL's questionnaire, as it was constituted in 2008, and thus judges and judicial candidates who respond to the questionnaire (worded and formatted as it was) express their views on certain legal, political, and social issues, but do not create a situation where their

impartiality might reasonably be questioned or commit or appear to commit to reach a particular

result or to rule in a particular way. Accordingly, the Plaintiffs' claim that the Prior-Commitment

Recusal Requirement (Rule 2.11(A)(5) of the 2009 Code), as well as the general disqualification

requirement (Rule 2.11(A) of the 2009 Code), is unconstitutional fails, and on Count V,

judgment will be entered in favor of the Defendants and against the Plaintiffs.


(3)     The Partisan Activities Restriction

        The Partisan Activities Restriction (Rules 4.1(A)(1) and (2) of the 2009 Code) is

essentially the same as the "partisan activities clauses" of the pre-2009 Code (former Canon

5A(1)(a) & (c)). Except as otherwise permitted by the Code, it prohibits judges and judicial

candidates from acting as leaders or holding offices in political organizations and making

speeches on behalf of political organizations. The 2009 Code defines "political organization" as

"a political party or other group sponsored by or affiliated with a political party or candidate, the

principal purpose of which is to further the election or appointment of candidates for political

office." The term, however, excludes a judicial candidate's campaign committee created

pursuant to Rule 4.4.

        Comment 1 to Rule 4.1 summarizes the interests implicated by the partisan activities of

judges and judicial candidates:

> Even when subject to public election, a judge plays a role different from that of a
> legislator or executive branch official. Rather than making decisions based upon
> the expressed views or preferences of the electorate, a judge makes decisions
> based upon the law and the facts of every case. Public confidence in the
> independence and impartiality of the judiciary is eroded if judges or judicial
> candidates are perceived to be subject to political influence. In furtherance of this
> interest, judges and judicial candidates must, to the greatest extent possible, be
> free, and appear to be free, from political influence and partisan interests.

Therefore, this Canon permits only narrowly-tailored exceptions to the prohibitions against political activities of judges and judicial candidates, taking into account the different methods of judicial selection and the role of the electorate in selecting and retaining its judiciary.

Rule 4.1, cmt. 1; *see also* Rule 4.2(A)(1) ("A judicial candidate in a partisan, nonpartisan, or retention public election shall . . . act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary."). Rule 4.1(A)(1) prohibits judges and judicial candidates from assuming leadership roles in political organizations, but permits them to register to vote as members of a political party. Rule 4.1, cmt. 3. Rule 4.1(A)(2) prohibits judges and judicial candidates from making speeches on behalf of political organizations, but does not prohibit them from campaigning on their own behalf. Rule 4.1, cmt. 4. Of course, judges and judicial candidates may participate in the political process as voters, Rule 4.1, cmt. 6, and the family members of judges and judicial candidates are not bound by the Code (although some special concerns arise regarding public associations with the political activity and campaigns of family members and regarding the need to avoid any implication that the prestige of judicial office is being used), Rule 4.1, cmt. 5. Additionally, judges and judicial candidates may participate in ceremonies and similar public events with other public officials, such as riding in parades and participating in public inaugural activities, because they do not constitute political conduct. Rule 4.1, cmt. 8.

Rule 4.1(C) permits the following activities:

(C) A judge in an office filled by partisan election, a judicial candidate seeking that office, and a judicial officer serving for a judge in office filled by partisan election may at any time:
(1) identify himself or herself as a member of a political party;
(2) voluntarily contribute to and attend meetings of political organizations; and

> (3) attend dinners and other events sponsored by political
> organizations and may purchase a ticket for such an event and a
> ticket for a guest.

Rule 4.1(D) permits the following:

> A judge in an office filled by nonpartisan election other than a retention election,
> a judicial candidate seeking that office, and a judicial officer serving for a judge
> in an office filled by nonpartisan election may at any time attend dinners and
> other events sponsored by political organizations and may purchase a ticket for
> such an event and a ticket for a guest.

In addition to the activities permitted under Rule 4.1(C), Rule 4.2(B) permits candidates for

partisan elective judicial offices to establish a campaign committee and accept campaign

contributions pursuant to Rule 4.4; to speak on behalf of their own candidacies; to publicly

endorse and contribute to candidates for election to public office running in the same election

cycle; to attend dinners and other events for candidates for public office running in the same

election cycle and to purchase a limited number of tickets for the event; to seek, accept, or use

endorsements from any person or organization, including a political organization; and to identify

themselves as candidates of a political organization. Thus, in partisan public elections for

judicial office, a judicial candidate "may be nominated by, affiliated with, or otherwise publicly

identified as a candidate of a political organization." Rule 4.2, cmt. 3. In addition to the activities

permitted under Rule 4.1(B),[19] Rule 4.2(C) permits candidates for nonpartisan elective judicial

office to establish a campaign committee and accept campaign contributions pursuant to Rule

4.4; to speak on behalf of their own candidacies; to publicly endorse, contribute to, and attend

functions for other candidates running for the same judicial office for which they are running;

and to seek, accept, or use endorsements from any appropriate person or organization other than

---

[19] Reference to Rule 4.1(B) appears to be a scrivener's error. It seems that the correct reference should be
Rule 4.1(D).

a political organization. Rule 4.2(D) permits candidates for retention to judicial office to engage in certain specified campaign activities only when a candidate's retention has drawn active opposition. Rule 4.2, cmt. 1. In nonpartisan public elections or retention elections, "candidates are prohibited from seeking, accepting, or using nominations or endorsements from partisan political organizations." Rule 4.2, cmt. 4. Additionally, "[a]lthough judicial candidates in nonpartisan public elections are prohibited from running on a ticket or slate associated with a political organization, they may group themselves into slates or other alliances to conduct their campaigns more effectively." Rule 4.2, cmt. 7. Rules 4.2(B) and (C) restrict the activities approved in Rules 4.2(B) and (C) to the period of "one year before the first applicable electoral event." Rule 4.2, cmt. 1. As noted above, judicial candidates in both partisan and nonpartisan elections may attend dinners and other events sponsored by political organizations and may purchase a ticket for such an event and a ticket for a guest. Rule 4.2, cmt. 5. Although Rule 4.2(B), (C), and (D) "permit judicial candidates in public elections to engage in some political or campaign activities otherwise prohibited by Rule 4.1," Rule 4.2, cmt. 1, "judicial candidates for public election remain subject to many of the provisions of Rule 4.1," for example, the prohibition on soliciting funds for a political organization and making certain promises, pledges, or commitments related to future adjudicative duties, Rule 4.2, cmt. 2.

From a review of Canon 4 and the rules under it, it is apparent that the Partisan Activities Restriction is designed to serve the compelling interests in judicial independence (a judge's freedom from influence or controls other than those established by law), judicial integrity (a judge's probity, fairness, honesty, uprightness, and character), and judicial impartiality (the absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well

as the maintenance of an open mind in considering issues that may come before the judge), as well as the principles of justice and the rule of law. It is informed by the Indiana Supreme Court's understanding of the adjudicative function of courts and the important role of judges in making decisions in specific cases based upon their application of the law to the facts of each case. The Court finds that the Indiana Supreme Court has carefully designed the rules and the exceptions to serve these interests and has tailored them to address the different methods of judicial selection in Indiana (methods prescribed by the people of Indiana through the Indiana Constitution and by their representatives through statutes) and to enhance the role of the electorate in selecting and retaining its judiciary. Under the restriction, the type and the level of partisan activities permitted vary depending upon the applicable method of selection, and this fine-tuning of the restriction serves to adjust the means (the regulation of partisan activities) to fit the ends (the identified interests).

Judge Certo wants to engage in partisan activities (including serving as a delegate to the Indiana State Republican Convention and speaking on behalf of Republican judges and the Republican Party) that are presently proscribed by the rules. He argues that the Partisan Activities Restriction is underinclusive, overbroad, and vague. Relying largely on considerations of open-mindedness, he claims the Partisan Activities Restriction is underinclusive for the following reasons: some judicial candidates have long histories as politicians prior to seeking judicial office, but the restriction does not safeguard against such threatened impartiality; the restriction permits some partisan activities and associations between candidates and political parties, but it prohibits other activities; and the restriction does not prohibit judges and judicial candidates from being leaders and making speeches on behalf of groups such as the Sierra Club

65

and the National Rifle Association, which exist to advocate on behalf of certain issues, but it does not safeguard against any threat posed thereby to impartiality. He thinks the restriction is overbroad because he believes the restriction bans "all speech made in favor of a political party, which effectively prohibits candidates from announcing their views." (Pls.' Mem. in Supp. 34.) He thinks the restriction is vague because it does not clearly define what it means to act as a leader in a political organization and because the ban against speaking on behalf of a political organization fails to give fair warning of what conduct is prohibited.

The Court is not persuaded by Plaintiff Certo's underinclusive, overbroad, and vagueness arguments. The Partisan Activities Restriction is not as restrictive on speech and association as Judge Certo makes it out to be. The 2009 Code permits Judge Certo to engage in a broad range of speech (including expressions of views on legal, political, and social issues) and to identify with a political organization and attend political events. Additionally, the interests served by this restriction extend well beyond open-mindedness and include, as the Court noted earlier, judicial independence, integrity, and impartiality, as well as the principles of justice and the rule of law. To limit the potential harm that results from judges acting based upon political influence, party agendas, and partisan interests rather than the rule of law, the Indiana Supreme Court has determined that the partisan activities of judges and judicial candidates should be regulated so as to permit those with less potential for harm and prohibit those with the greatest potential for harm. As the Supreme Court noted in *Caperton*, there is an important need to maintain a judiciary that is (and appears to be) fair, independent, and impartial. It is true that some individuals with long political histories become judges, but they too become subject to the same rules governing judicial impartiality, independence, and integrity, which helps to put their

political and partisan histories in the past. Prohibiting judges and judicial candidates from acting as leaders and holding offices in political organizations and from making speeches on behalf of political organizations addresses concerns raised by public and official involvement with political organizations and their agendas, but these concerns do not arise or do not rise to the same level with campaign activities permitted by Rules 4.1 and 4.2. Plaintiff Certo is correct that Canon 4 and the related rules address political and campaign activities of judicial candidates in public elections, and not other potential associations that judicial candidates may have, such affiliations with churches, issue advocacy groups, or other nonprofit institutions. However, to be constitutional the Partisan Activities Restriction and the other rules related to Canon 4 need not address all other potential associations and activities, which may be more appropriately addressed by general rules such as the disqualification requirement. The rules regulating the political and campaign activities of judges and judicial candidates are tailored to address the special threats to judicial fairness, impartiality, independence, and integrity, as well as the principles of justice and the rule of law, that are posed by involvement in ordinary political and campaign activities in public elections. Finally, judges and judicial candidates are capable of determining what it means to act as leaders (i.e., to "assum[e] leadership roles," Rule 4.1, cmt. 3) and hold offices in political organizations and what it means to make a speech on behalf of a political organization.

For these reasons, the Court finds that the Partisan Activities Restriction (Rules 4.1(A)(1) and (2) of the 2009 Code) is narrowly tailored to serve judicial fairness, impartiality, independence, and integrity, as well as the principles of justice and the rule of law. Accordingly, Plaintiff Certo's claim that the Partisan Activities Restriction (Rules 4.1(A)(1) and (2) of the

2009 Code) is unconstitutional on its face and as applied fails, and on Counts VIII and IX, judgment will be entered in favor of the Defendants and against the Plaintiffs.

(4)    The Partisan Solicitation Restriction

The Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8) of the 2009 Code) is essentially the same as the "solicitation clauses" in the pre-2009 Code (former Canons 5A(1)(e) & 5C(2)). Except as otherwise permitted by the Code, it prohibits judges and judicial candidates from soliciting funds for, paying assessments to, or making contributions to political organizations or candidates for public offices and from personally soliciting or accepting campaign contributions other than through a campaign committee authorized by Rule 4.4.

The Court's earlier discussion of general considerations relative to the Partisan Activities Restriction applies to its evaluation of the Partisan Solicitation Restriction, and the Court will not repeat it here. It is helpful to consider the comments included under Rule 4.4 that relate to the Partisan Solicitation Restriction. Comment 1 to Rule 4.4 recognizes that, "in many jurisdictions, judicial candidates must raise campaign funds to support their candidacies, and [Rule 4.4] permits candidates, other than candidates for appointive judicial office or candidates for retention who have not met active opposition, to establish campaign committees to solicit and accept reasonable financial contributions or in-kind contributions." Rule. 4.4, cmt. 1. However, judicial candidates "are prohibited [by Rule 4.1(A)(8)] from personally soliciting campaign contributions or personally accepting campaign contributions." Although judicial candidates "are responsible for compliance with the requirements of election law and other applicable law, and for the activities of their campaign committees," campaign committees "may solicit and accept

campaign contributions, manage the expenditure of campaign funds, and generally conduct campaigns." Rule 4.4, cmt. 2. Judicial candidates are required to instruct their campaign committees, at the beginning of a campaign, "to solicit or accept only such contributions as are reasonable in amount, appropriate under the circumstances, and in conformity with applicable law." Rule 4.4, cmt. 3. Comment 3 to Rule 4.4 provides additional instruction regarding lawyers and others who might appear before a successful candidate:

> Although lawyers and others who might appear before a successful candidate for judicial office are permitted to make campaign contributions, the candidate should instruct his or her campaign committee to be especially cautious in connection with such contributions, so they do not create grounds for disqualification [under Rule 2.11] if the candidate is elected to judicial office.

Rule 4.4, cmt. 3.

Plaintiff Certo argues that the Partisan Solicitation Restriction does not serve the interest in preserving impartiality, that it is underinclusive by prohibiting personal solicitations while permitting judicial candidates to know who has donated to their campaigns and by not prohibiting candidates from accepting funds, and that it is overbroad in prohibiting any and all personal solicitations, rather than quid pro quo solicitations that pose the real concern. However, Rule 4.1(A)(8) does prohibit personal solicitation or acceptance of campaign contributions, except through the campaign committee mechanism. Additionally, the interests served by the Partisan Solicitation Restriction are several, including judicial fairness, impartiality, independence, and integrity, as well as the principles of justice and the rule of law. It protects both the judiciary and potential donors (whether citizens or attorneys), and Plaintiff Certo has himself admitted that personal solicitations have additional leverage. This restriction is designed to safeguard the judiciary and judges from political influence and partisan interests and to

promote public confidence in the independence and impartiality of the judiciary. The interest in judicial independence is served by prohibiting solicitations, payments, and contributions that have the potential to compromise a judge's freedom from influence or control. The interest in judicial impartiality is served by restricting solicitations, payments, and contributions that have the potential to contribute to bias or prejudice in favor of or against particular parties or classes of parties and undermine the maintenance of an open mind in considering issues that come before the judge. Likewise, the interest in judicial integrity is served by limiting solicitations, payments, and contributions that have the potential to compromise a judge's probity, fairness, honesty, uprightness, and soundness of character. The restriction promotes the principles of justice and the rule of law by building barriers between judges and partisan politics and giving added insurance that judges will decide cases based upon the law applied to the facts, rather than solicitations accepted or turned away, money paid or not, and contributions made or not. Again, there is a significant difference between candidates, on the one hand, identifying themselves as members of political parties and attending political events and, on the other hand, soliciting funds for a political party or a candidate. This difference warrants permitting the one and prohibiting the other. Additionally, although Plaintiff Certo may have campaign debts that he desires to retire and a personal desire to engage in some presently prohibited solicitation activities, he has come forward with little evidence to show that his circumstances or desires are unique or that he is somehow specially affected by an application of the Partisan Solicitation Restriction.

For these reasons, the Court finds that the Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8) of the 2009 Code) is narrowly tailored to serve judicial fairness, impartiality,

independence, and integrity, as well as the principles of justice and the rule of law. Accordingly, Plaintiff Certo's claim that the Partisan Solicitation Restriction (Rules 4.11(A)(4) & (8) of the 2009 Code) is unconstitutional on its face and as applied fails, and on Counts VI and VII, judgment will be entered in favor of the Defendants and against the Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Plaintiffs' Motion for Summary Judgment [DE 70] and GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment [DE 72]. The Court ORDERS that Counts I and II of the Plaintiffs' Verified Second Amended Complaint for Relief BE DISMISSED WITH PREJUDICE and that the preliminary injunction entered on May 6, 2008, BE VACATED. The Court also ORDERS that JUDGMENT BE ENTERED in favor of the Defendants and against the Plaintiffs on Counts III through IX of the Plaintiffs' Verified Second Amended Complaint for Relief.

SO ORDERED on July 7, 2009.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION